IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JEANETTA WILLIAMS, ) | |
| as Independent Administrator for the ) | |
| Estate of Dontrell Taquon Mundine- ) | |
| Williams, deceased, ) | |
| ) | **Case No. 3:19-CV-739-MAB** |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| ILLINOIS DEPARTMENT OF ) | |
| CORRECTIONS, JOHN R. BALDWIN, ) | |
| and WEXFORD HEALTH SOURCES, ) | |
| INC., ) | |
| ) | |
| Defendants. ) | |

<u>MEMORANDUM AND ORDER</u>

**BEATTY, Magistrate Judge:**

This matter is currently before the Court on the motions for summary judgment and motions to exclude Plaintiff's experts filed by Defendants John Baldwin, the Illinois Department of Corrections, and Wexford Health Sources, Inc. (Docs. 140, 142, 144, 145). For the reasons explained below, the motions for summary judgment as well as the motions to exclude Plaintiff's experts are granted.

<u>BACKGROUND</u>

Plaintiff Jeanetta Williams brought this suit in her capacity as independent administrator for the estate of her son, Dontrell Taquon Mundine-Williams, who committed suicide on December 1, 2017, while incarcerated at Lawrence Correctional Center. Ms. Williams alleges, in short, that Defendants were well aware of Dontrell's

mental health issues but failed to provide him with adequate care and treatment due to systemic deficiencies within the IDOC, which led to Dontrell committing suicide.

In the Second Amended Complaint, (Doc. 95), which is the operative complaint, Plaintiff expressly set forth the following claims:

Count 1: Eighth Amendment deliberate indifference claim against John Baldwin for placing Dontrell in extended solitary confinement rather than providing effective treatment for his mental illness;

Count 2: Claims under the Americans with Disabilities Act against the IDOC for discriminating against Dontrell based on his mental illness and failing to accommodate his mental illness;

Count 3: Claims under the Rehabilitation Act against the IDOC for discriminating against Dontrell based on his mental illness and failing to accommodate his mental illness;

Count 4: Claim against John Baldwin under the Illinois Wrongful Death Act, 740 ILL. COMP. STAT. 180/1, and the Illinois Survival Act, 755 ILL. COMP. STAT. 5/27-6, based on negligence;

Count 5: Wrongful death and survival action against Wexford based on negligence;

Count 6: Wrongful death and survival action against John Baldwin for willful and wanton conduct; and

Count 7: Wrongful death and survival action against Wexford for willful and wanton conduct.

## FACTS

The following facts were established by the summary judgment evidence and largely address only the details of Dontrell's incarceration. Other facts relevant to Plaintiff's claims are set out in the respective discussions of those claims later in this Order.

Defendant John Baldwin was the Director of the IDOC from August 2015 to May 2019 (Doc. 144-2, pp. 8–9). Wexford is a private corporation that is contracted with the State of Illinois to provide medical and mental health care to prisoners in IDOC custody.

Dontrell Williams had a history of mental illness and treatment, including multiple inpatient hospitalizations and partial hospitalizations by the time he was 13 years old (Doc. 174-1). The records from those hospitalizations show that Dontrell was diagnosed with mood disorder, and at times given a co-diagnosis of attention deficient hyperactivity disorder (Doc. 174-1, pp. 3, 9, 13, 17, 25).[1]  The records reflect that Dontrell was irritable, easily agitated, and explosive; restless, hyperactive, and fidgety (Doc. 174-1). He was impulsive and unable to control himself or follow directions, and disruptive at school and during therapy (*Id.*). He was aggressive and threatening toward others, got into verbal and physical altercations with siblings and peers, and acted oppositional and defiant toward adults (*Id.*). He destroyed property and had to be held down during tantrums (*Id.*). And he was suicidal at times (*Id.*). Dontrell was treated with medication and therapy (*see id.*). In particular, he was prescribed lithium and Concerta, and at times Risperdal and Ritalin (*Id.*).

There is a gap in the record regarding Dontrell's mental health from age 13 to age 21. The information picks up again on June 1, 2017, when Dontrell arrived at the Northern Reception and Classification Center ("NRC") at Stateville Correctional Center, following a parole violation, where he stayed for approximately two months (Doc. 144-1; *see* Doc.

---

[1] There was also one occasion where he was diagnosed with depressive disorder and oppositional defiant disorder (Doc. 174-1, p. 21).

141-5, p. 361).[2]  A Mental Health Screening was conducted upon his arrival,[3] and Dontrell

self-reported diagnoses of impulse control disorder and bipolar disorder,[4] four previous

suicide attempts, and 15 previous psychiatric hospitalizations, the most recent being in

2016 after he tried to hang himself (Doc. 172-6, pp. 12–15). Dontrell was evaluated for

suicide potential and determined to be a non-risk (*see id.* at p. 13).[5] Dontrell reported that

he was "good," and the MHP noted that he was calm, cooperative, and presented as

stable. The screening documented that Dontrell was taking divalproex, which was also

confirmed in a psychiatrist's note from the same day (*Id.* at p. 11).[6] It was noted that the

---

[2] Dontrell was initially incarcerated in the IDOC in March 2016 and released in October 2016 (Doc. 144-1). While mental health records exist from this period of incarceration, they were not provided to the Court.

[3] IDOC Administrative Directive 04.04.100(e) defines a Mental Health Screening as "a generalized review and interview process to identify offenders who may require mental health services." (Doc. 144-4, p. 3).

[4] It is unclear when Dontrell received a diagnosis of bipolar disorder and who made the diagnosis. Bipolar disorder was listed as a "provisional diagnosis" in the January 2010 records from Hartgrove Hospital but not as a final "discharge diagnosis" (Doc. 174-1, p. 3). And various records from Dontrell's incarceration reflect that he self-reported a diagnosis of bipolar disorder, as well as at least one occasion where he self-reported a diagnosis of schizophrenia (Doc. 172-7; Doc. 144-12, p. 2; Doc. 172-6, p. 1). However, as far as the Court can tell, there are no medical records in evidence in which a mental health provider actually diagnosed Dontrell with bipolar disorder.

[5] Plaintiff erroneously claimed that Dontrell did not receive an Evaluation of Suicide Potential until 11 days after his Mental Health Screening in violation of the requirements of IDOC Administrative Direction 04.04-100 (Doc. 173, p. 15).

[6] The psychiatrist's note lists Depakote as the medication and also includes a reference to "VPA," which is a common abbreviation for valproic acid. Divalproex sodium and valproic acid are "similar medications that are used by the body as valproic acid." MEDLINE PLUS, *Valproic Acid*, https://medlineplus.gov/druginfo/meds/a682412.html (last visited Feb. 1, 2023). Depakote is listed as a brand name for both divalproex sodium and valproic acid. *Id.*; MAYO CLINIC, *Divalproex Sodium*, https://www.mayoclinic.org/drugs-supplements/divalproex-sodium-oral-route/description/drg-20072886 (last visited Feb. 1, 2023). It appears that practitioners in this case essentially used the three names—divalproex, VPA, and Depakote—interchangeably. The medication is an anticonvulsant used to treat certain types of seizures. MEDLINE PLUS, *Valproic Acid*. It is also used to treat mania in people with bipolar disorder and to prevent migraine headaches. *Id.*

medication was prescribed by medical staff, and not as a psychotropic for a mental health condition (*Id.*). The medication was "bridged for 30 days" while Dontrell waited "to see psychiatry" (*Id.*; *see also id.* at p. 15).

Dontrell's two-month stint at the NRC was troubled. He was put on crisis watch on two occasions, the first after he purportedly drank bleach[7] and the second after he was found making cuts on his arm with a staple and said he "want[ed] to die" (Doc. 172-6, pp. 16–29, 36, 64–68; Doc. 172-7, p. 1). He was seen for a crisis response another four times; three because he was "going crazy" and "bugging" about the lack of information as to whether a home site had been found so he could be released from prison (Doc. 141-5, pp. 19–26). The fourth time was at the request of security because Dontrell was "hostile, agitated, and uncooperative" regarding a housing placement (*Id.* at pp. 25–26). Dontrell also received three disciplinary tickets at the NRC. The first for threatening an officer and for kicking and banging on the door of his cell (Doc. 144-8, pp. 20–21). The second for throwing urine on another inmate (*Id.* at pp. 1, 19). And the third for putting pages from a book over the windows of his cell and refusing to remove them when ordered to do so (*Id.* at pp. 15, 18). He was given one month segregation on each ticket, which was approved by a reviewing MHP (*Id.* at pp. 1, 15–17; Doc. 144-7).

Dontrell saw Dr. Aswin Jayachandran for a psychiatric diagnostic evaluation on July 6, 2017—halfway through his time at the NRC (Doc. 141-5, pp. 1–18). The doctor

---

[7] According to the report of Dr. Michael Jarvis, who is Wexford's retained expert witness, Dontrell stated the following day on June 5, 2017, "I was trying to get out of my cell. I said I drank bleach but I didn't. I got family. I'm not trying to die." (Doc. 142-4, p. 3). The mental health record from June 5, 2017 does not appear to be part of the records provided to the Court (*see* Doc. 141-5, Doc. 144-15, Doc. 172-6).

wrote that Dontrell's "Chief Complaint" was "'Depression' 'Bipolar.'" The doctor also noted that Dontrell was currently taking Depakote for his seizures, and had previously taken lithium, Abilify, and Remeron, but not since 2015. Dontrell reported some "low moods, frustration due to personal stressors" but denied persistent depression. He also reported some increased insomnia, increased fatigue, and decreased appetite. He denied having any current suicidal ideations. The doctor indicated that Dontrell was a moderate suicide risk due to his history of multiple suicide attempts and hospitalizations and "current depression." He also noted that Dontrell exhibited certain personality characteristics, including repeated lawless behavior, impulsivity, repeated physical fights or assaults, reckless disregard for others, lack of remorse, and affective instability. The doctor's diagnosis was adjustment disorder with mixed emotions and conduct ("adjustment disorder"), depressive disorder, and anti-social personality disorder ("ASPD") traits. The doctor also wrote "[rule out] disruptive impulse control disorder." He did not designate Dontrell as SMI. He prescribed Remeron, which is an antidepressant, "for moods/insomnia" and ordered a follow-up appointment in one month, per the requirements of IDOC policy (Doc. 144-16, p. 3; *see* Doc. 144-16, p. 3, Administrative Directive 04.04.101). The follow-up appointment never occurred, however, because Dontrell was transferred to Lawrence Correctional Center on July 28, 2017, where he remained until his death on December 1, 2017 (*see* Doc. 144-1).

Upon his arrival at Lawrence, a mental health screening was conducted (Doc. 141-5, pp. 27–40). Dontrell misreported that he had never been hospitalized for psychiatric treatment and had never attempted suicide (*Id.* at p. 27). The screener noted that

Dontrell's behavior was unremarkable, he was cooperative, in a good mood, and able to stay focused on the session (*Id.* at p. 30). His diagnosis was listed as adjustment disorder and his current medications were listed as Remeron, Depakote, and Benadryl (*Id.* at pp. 36, 40). The screener determined that Dontrell was not a suicide risk and referred him to a psychiatrist and for a mental health evaluation and services (*Id.* at pp. 30, 31–34, 36–37).

The mental health evaluation was completed approximately two weeks later, on August 11th (Doc. 141-5, pp. 43–59). Dontrell reported that "he [didn't] have any mental health concerns" and the only issue he had was trouble sleeping (*Id.* at pp. 43, 45, 56, 58). He also apparently misreported he had no history of psychiatric hospitalizations, outpatient treatment, suicidal behavior, or suicide attempts, that he was not hyperactive or prescribed Ritalin/Adderall/Concerta as a child, and that he does not have fluctuating moods (*Id.* at pp. 46, 47, 56). The misinformation led the MHP to conclude that Dontrell had "no past [mental health] or psych [history] on the outside" and did not have any symptoms or meet any criteria for a mental health diagnosis, although his chart listed a diagnosis of adjustment disorder (*Id.* at pp. 43, 58). The MHP indicated that Dontrell would continue to follow-up with MHP every 60 days and he was referred to psychiatry because he was taking Remeron (*Id.* at p. 43).

A note in Dontrell's medical record from the next day indicates that Dontrell had a history of non-compliance with his seizure medications (Doc. 172-6, pp. 2–3). He told the nurse that he does not take his morning medications because the Remeron "makes him 'sleep hard'" so he is unable to hear the morning call for medications (*Id.*). The day after that, Dontrell received a ticket for fighting with his cellmate, whom he claimed was

stealing his stuff (Doc. 144-7; Doc. 144-8, pp. 13–14). Dontrell was apparently not designated as SMI at this time, and it does not appear that mental health was consulted regarding potential punishment on this ticket (*see* Doc. 144-7; Doc. 144-8, pp. 13–14; Doc. 141-5). He was given one month in segregation (Doc. 144-8, pp. 13–14).

On August 17th, MHP Leann Hartleroad met with Dontrell at the request of security because Dontrell was cutting his arm with a staple and banging his head on the cell door (Doc. 172-6, p. 4; Doc. 141-5, pp. 63–83). Dontrell stated that he was going to kill himself, was refusing medication, and was angry his parole site was not approved (Doc. 141-5, pp. 83). He was deemed a suicide risk and placed on crisis watch until August 20th, when it was discontinued (*Id.* at pp. 83–94). It was resumed four days later when Dontrell told an officer that "he wanted to hurt himself" and threatened to cut himself with a staple (Doc. 141-5, pp. 97–99). The next morning, Dontrell told the MHP "that he was 'stressed out' the night before and needed to speak with mental health" but "officers 'lied on him' about reports of cutting himself with a staple" (*Id.*). Dontrell said he was no longer stressed out and wanted to leave crisis watch (*Id.*). Later that same day, Dontrell once again reported that he was fine (*Id.* at p. 117). The MHP noted that he presented as stable and indicated "an understanding of the coping skills needed to maintain stability" and "an intent to implement deep breathing and relaxation techniques in an effort to reduce anxiety" (*Id.*). It was determined that he was no longer a suicide risk and he was released from crisis watch (*Id.* at pp. 117, 119–22).

An MHP met with Dontell ten days later on September 4th for post-crisis watch follow-up and to update his treatment plan (Doc. 141-5, pp. 125–36). He presented as

stable and denied any acute mental health symptoms or current issues (*Id.*). However, a number of incidents occurred throughout the month. On September 9th, Dontrell was ticketed for insolence and drugs after he yelled and cursed at and threatened a nurse who discovered he had been hoarding his seizure medications (Doc. 144-8, pp. 10–12). He was punished with three months in segregation (*Id.*) He later said he was not taking the medications because they made his head and stomach hurt (Doc. 141-5, p. 211).

On September 12th, Dontrell called for a crisis team member (Doc. 141-5, pp. 139–42; *see also id.* at pp. 143–47). He said he had "been buggin' up" since the fire alarm went off that morning, and he also vented frustrations about being in segregation—not having his time adjusted, the wing being loud, and not getting along with his neighbor. The MHP helped Dontrell calm himself down and no crisis watch was implemented (*Id.*). Two days later, however, Dontrell was put on crisis watch after he "braided and tied a sheet around his neck" (Doc. 141-5, pp. 149–73). The next day, he said he did not actually want to harm himself, he just wanted to get an MHP to come to his door (*Id.* at p. 167). Crisis watch was terminated, and Dontrell was returned to segregation (*Id.*). He was given a ticket for damage or misuse of property for tearing up his bed sheet and punished with one month on C Grade (Doc. 144-7; Doc. 144-8, pp. 8, 9).

On September 19th, Dontrell called for a crisis team member and stated that he "wants to [be] back on watch" because he sleeps better over there and can talk with his friends through the vents (Doc. 141-5, p. 175–78). He presented as stable and his request was denied (*Id.*). However, a week later on September 26th, he was put on crisis watch after he met with an MHP and was upset about various things (*Id.* at p. 211). He reported

that "earlier in the day, he had a sheet tied around his neck and he was going to jump off

his bed but was caught," and he threatened to hang himself if he was sent back to his cell

(*Id.*). The next day, an MHP met with Dontrell and wrote:

> [Dontrell] continues to express anger over segregation time. He is unable to
> exercise patience and cannot tolerate being told "no." He acts out
> aggressively, throws feces, and threatens self-harm if he thinks his needs
> are unmet or that he is being ignored. Patient continued to yell and make
> demands and has not calmed enough for a thorough mental health
> assessment.

(*Id.* at p. 213). In the days that followed, Dontrell continued to demand that he be taken

off crisis watch and threatened to cut himself with a staple (that he did not actually have)

if he wasn't (*Id.* at pp. 215, 217). On September 30th, his fifth day on crisis watch, Dontrell

had calmed down and reported that he was "ready to come off watch" (*Id.* at p. 219). He

was returned to his cell in segregation, with an MHP to follow-up in seven days and

every 30 days thereafter for six months (*Id.*).

On October 2nd, two days after his crisis watch was discontinued, Dontrell saw

psychiatric Physician Assistant Travis James for a diagnostic evaluation (Doc. 141-5, pp.

225–34; *see also id.* at pp. 241–46). This was only Dontrell's second contact with a

psychiatric provider (the first occurring three months prior in July 2017 at Stateville). PA

James noted that Dontrell had medication orders for adjustment disorder and unspecified

depressive disorder. He asked Dontrell questions relating to his psychiatric history, social

history, suicide potential, potential for aggressive behavior, medical conditions,

psychiatric symptoms, personality, substance abuse history, and family history (*see id.*).

He documented Dontrell's diagnosis as "309.4 Adjustment disorder with disturbance of

conduct and emotion," continued Dontrell's prescription for Remeron, and indicated that outpatient level of care was appropriate for Dontrell (*Id.* at pp. 233, 234).

The following day, on October 3rd, Dontrell attended what appears to be his first group therapy session (Doc. 141-5, p. 237). It was a two-hour, out-of-cell session (*see id.*). MHP Leann Hartleroad documented that Dontrell was "positive and cooperative" (*Id.*). Dontrell attended group twice more that same week, where he interacted appropriately and positively, showed interest in the group, and gave appropriate feedback (*Id.* at pp. 247, 249). An MHP's notes from rounds that same week documented that Dontrell "presented as stable" with no mental health concerns (*Id.* at p. 239).

Dontrell continued attending and participating in group therapy sessions over the next couple weeks (Doc. 141-5, pp. 251, 253, 261, 265). MHP Basnett wrote during rounds that Dontrell had "much improved behaviors – no distress observed" (*Id.* at p. 239). After the group therapy session on October 24th, Dontrell met one-on-one with MHP Hartleroad "at the request of security" (*Id.* at p. 267). Hartleroad noted that Dontrell was angry about not yet having an approved parole site and stated that "the IDOC is purposefully keeping him incarcerated" (*Id.*). She spoke to Dontrell about parole placement procedures and discussed coping skills that he could use "to avoid . . . re-emergence of impulsive behaviors" (*Id.*). And on October 25th, MHP Basnett wrote during rounds that she had no mental health concerns regarding Dontrell (*Id.* at p. 240). The following morning, however, Dontrell was involved in an incident where he managed to pull an officer's arm through the cuff port of his cell, injuring the officer (Doc. 144-7; Doc. 144-8, pp. 3–7).

Mental health records indicate that Dontrell had been upset since the early morning hours, which "prompted yelling, threatening harm to staff, taking his chuckhole, and assaulting staff" (Doc. 141-5, p. 289). MHP Basnett met with Dontrell throughout that day due to his combative, threatening behavior, and assisted him in calming himself down (*Id.*). But by the end of the day, Dontrell was "inconsolable" "due to peers making fun of him, and constantly stressful stimuli" (*Id.*). Around 2:00p.m., Basnett put Dontrell on crisis watch due to "threatening behavior, rapidly increasing agitation, and inability to calm down" (*Id.* at pp. 289, 269–71). She wrote that it was "more for a respite than any type of crisis . . . to allow for processing the day's events . . . in a quieter environment" (*Id.* at p. 289; *see also id.* at pp. 274, 279).

Basnett went to see Dontrell the next morning (Doc. 141-5, p. 291). Before she entered the wing, officers reported that Dontrell had "taken his chuckhole hostage, grabbed the shield stand, and was throwing feces at anyone nearby." As Basnett entered the wing, she observed feces on Dontrell's window, door, and floor, and on the staircase. And as she approached Dontrell's cell door, she observed feces "everywhere." He had his arm through the chuckhole and began yelling about his frustrations. Dontrell was "eventually, after quite some time," able to calm himself down. He agreed to clean his cell and give up his chuckhole in exchange for a shower, a move to a clean cell, and permission to have a book. Dontrell's crisis watch was continued (*Id.* at pp. 293–97).

The next day (October 28th), MHP David Penk saw Dontrell on crisis watch (Doc. 141-5, p. 297). Dontrell reported that he was not getting his medications for schizophrenia and ADHD and said, "I won't come out of here until I get my medication or a

psychological evaluation. I'm going to bang my head." According to Dontrell, he was diagnosed with schizophrenia at age six because he was hearing voices, but he denied that he was currently experiencing hallucinations. Dontrell also said that he took Zoloft and lithium on the outside and had been taking them since age 12. Penk noted that Dontrell "was wrapped in his safety mattress" and his "mental health symptoms [were] negatively impacting his daily functionality." Dontrell's crisis watch was continued.

The next day (October 29th), MHP Amy Deel-Hout saw Dontrell on crisis watch for five minutes (Doc. 141-5, pp. 299–300). He reported that officers and porters "keep picking on me" and stated once again that he needed Zoloft and lithium. Deel-Hout wrote that she talked with Dontrell about his seizure medication and that the reason he was in segregation was because he was not taking it and was hoarding it. He told Deel-Hout that he had been taking it. Deel-Hout also discussed "managing conflict with others in a positive way." Dontrell was released from crisis watch and returned to segregation (*Id.* at p. 299; *see also id.* at pp. 301–04). But he called for a crisis team member the next morning (Doc. 141-5, pp. 305–08). He was shouting and threatening harm on staff because he was upset that his hygiene products and a few of his personal items were missing. MHP Basnett wrote that Dontrell "continues to take incidents [such] as these very personally, which makes him increasingly angry and combative." She told Dontrell that he could speak with the Lieutenant but he first had to organize his thoughts and be able to identify the problem and offer a potential solution. Basnett determined that crisis watch was not warranted and left once Dontrell appeared stable. She later took him some mental health worksheets to complete.

During the first week of November, Dontrell attended group therapy three times (Doc. 141-5, pp. 313, 317, 319). Each time, MHP Hartleroad noted that Dontrell was cooperative and positive, interacted appropriately, showed interest in the topics, and gave appropriate feedback (*see id.* at pp. 247, 249, 251, 253, 265, 313, 317, 319). Haley Basnett indicated during rounds that she had no mental health concerns about Dontrell (*Id.* at p. 340). And during a one-on-one post-crisis follow-up on October 3rd, Basnett wrote that Dontrell was "in good spirits," presented as stable, and had been able to abide by segregation rules without any incidents with peers or staff since the previous week (*Id.* at pp. 309–12, 315). Basnett wrote that she commended Dontrell "on his commitment to decreasing his impulsivity," and noted that he had been attending group therapy, during which he was cooperative and participative, and demonstrated healthy communication skills with staff and peers. She and Dontrell spoke about using mindfulness exercises when feeling frustrated and he said, "I can't believe how good it works." Basnett's note from the session indicated that Dontrell was designated as SMI.

On November 8th, MHP Haley Basnett updated Dontrell's treatment plan to reflect the problems he was having, the therapeutic goals for addressing those problems, and the treatments/activities that he required (Doc. 141-5, pp. 321–26). She indicated that Dontrell was *not* SMI (*Id.* at p. 321). The plan was signed off on by other members of the Multidisciplinary treatment plan (*see id.* at p. 325). The following day, Dontrell attended group therapy (*Id.* at p. 327), and the day after that Dontrell met with Psychiatric PA Travis James for 20 minutes (*Id.* at pp. 329–36). Dontrell reported that he was "stressing more and more." James noted that Dontrell was diagnosed with impulse control disorder

and was "constantly agitated." He wrote that the "MHP gives [Dontrell] activities but [he] is in need of a mood stabilizer to reduce mania," however, Dontrell "refuses mood stabilizers." When asked to describe his mood, Dontrell said, "I just get stressed and mad quick. I hated Depakote. I know Zoloft kept me straight when I was on the outside." James documented that Dontrell was taking Remeron and compliant with the medication, which was "somewhat effective." In the diagnostic section of the note, James wrote that Dontrell was a moderate risk. Specifically, at the time of the appointment, Dontrell was no or low risk, but he "gets agitated so quickly" and "when he does, he is high risk." Dontrell did not have any suicidal thinking or plans. He had limited insight into his issues and poor overall judgment. Regarding impulse control issues, James wrote, "daily almost, kicks cell, yells at staff, is inappropriate." James wrote a prescription for 50mg of Zoloft for Dontrell.

On November 14th, the Adjustment Committee held its hearing on the tickets Dontrell received for the October 26th incident (*see* Doc. 144-8, p. 3). Dontrell was not designated as SMI at the time of the incident, or apparently at the time of the hearing. An MHP was present at the hearing but there is no indication that they were consulted regarding a potential punishment (*see id.*). The Committee gave Dontrell six months in segregation and revoked three months of good conduct credit (Doc. 144-7, Doc. 144-8, pp. 2–3). The decision was not served on Dontrell until November 26th (Doc. 144-9, p. 2).

On the morning of November 15th, Dontrell told the MHP on rounds that he was "good" (Doc. 141-5, p. 339). That afternoon, however, Dontrell met with PA Travis James and said that he was "having hallucinations and shit" and asked James to "lower [his]

meds" (*Id.* at p. 337). James lowered Dontrell's Zoloft dosage to 25 mg.

On November 16th, Dontrell attended group therapy; per usual, MHP Hartleroad documented that Dontrell interacted appropriately and positively, showed interest in the group, and gave appropriate feedback (Doc. 141-5, p. 341). On November 18th, Dontrell met one-on-one with MHP David Penk for 10 minutes "per security request" (*Id.* at p. 343). Penk wrote that Dontrell was "experiencing some anxiety" due to the lack of information regarding his parole placement. Dontrell stated, "I aint been nothing. I don't know nothing. I'm trying to get in a half-way house in Chicago but nobody is helping me." Penk wrote that Dontrell was "functioning appropriately in segregation and his mental health symptoms [were] not negatively impacting his daily functioning." The plan was to continue encouraging Dontrell to utilize the coping skills he had learned when feeling depressed and anxious.

On November 20th, Dontrell met one-on-one for 10 minutes with MHP Leann Hartleroad for post-crisis follow-up assessment (Doc. 141-5, pp. 345–50). He reported that he was "doing good," was compliant with his medications, and intended on attending group the next day. Hartleroad determined that Dontrell was not a suicide risk. MHP Haley Basnett's notes from rounds two days later indicate that Dontrell said he was "buggin up" and wanted information on the halfway house but Basnett also wrote there were no mental health concerns (*Id.* at p. 339).

On November 28th, Dontrell attended group therapy; the note from this session is the same as all the others and indicated that Dontrell interacted appropriately and positively, showed interest in the group, and gave appropriate feedback (Doc. 141-5, p.

353). The note makes no mention of the fact that Dontrell actually left group early because of dizziness caused by the Zoloft (*see id.* at pp. 351, 353). Travis James discontinued Dontrell's prescription for Zoloft, apparently without any face-to-face interaction with Dontrell (*Id.* at p. 351).

MHP Basnett's notes from rounds on November 29th stated that Dontrell "wants to move to B-wing; wants seg. cut" but she had no mental health concerns (Doc. 141-5, p. 355). Dontrell attended group therapy on the morning of November 30th and the note once again states that Dontrell interacted appropriately and positively, showed interest in the group, and gave appropriate feedback (*Id.* at p. 357). Later that afternoon, around 3:20 p.m., Dontrell met for 15 minutes with MHP Hartleroad for "patient follow-up" (*Id.* at p. 359). Dontrell "report[ed] continued frustration about not having an approved parole site or not yet being transferred from [Lawrence]." His mood was "frustrated, but overall positive," and he was mostly able to concentrate on the topic at hand but required redirection to stay on task. Hartleroad gave Dontrell positive feedback on maintaining compliance with his medication and encouraged him to keep it up. She helped him process his feelings about not having a place to parole to and they discussed his feelings about the possibility of staying in custody until his discharge date. Hartleroad gave Dontrell parole information from the counselor as well as extra journaling papers to occupy his time over the weekend. Dontrell said he was going to work on the group therapy homework assignment and write in his journal papers.

The following day, December 1st, Dontrell hung himself with a bed sheet (Doc. 141-5, pp. 361–65). Officers and inmates alike reported that Dontrell had been upset that

morning and had been yelling at correctional officers and the inmate porter and also flooded his cell (Doc. 172-1, pp. 2–22; *see* also Doc. 141-5, pp. 361–65). The inmate witnesses reported that Dontrell asked correctional officers more than once to speak with a crisis team member and an MHP, and he told correctional officers that he was going to kill/hang himself (Doc. 172-1, pp. 2–22). The officers, however, never called for a crisis team or an MHP (*Id.*). The witnesses reported that after Dontrell said he was going to hang himself, they did not hear anything more from him. He did not respond when an officer came to his door with lunch. He did not respond when an officer told him his water had been turned back on and asked if he was okay. He did not respond when an officer came to his door with soap and toilet paper. And he did not respond when an MHP came to his door on rounds. Dontrell's body was found around 3:45p.m. by an officer passing out dinner trays. He was cold to the touch and stiff.

## PRELIMINARY MATTERS

As a general matter, the Court must note that the briefing in this case was not ideal. At times, both sides overplayed their hands and made arguments unsupported by any relevant legal authority. Wexford's statement of facts is in paragraph form, with a string of citations at the end of each paragraph. The Court had to try to figure out which citation(s) matched each fact asserted in the paragraph. Plaintiff's responses to Defendants' facts and her own statement of facts are no better (which Wexford went to great lengths to hypocritically point out). Plaintiff's briefs are extremely lengthy and simultaneously provide too much and too little information. Wexford's briefs were often harsh in tone and spoke in absolutes. Their arguments were often poorly articulated and

poorly organized, making it difficult to discern the contours of Plaintiff's claims and the parties' arguments

The Court seriously contemplated striking all of the briefing and ordering the parties to redo it. But the Court had already spent an inordinate amount of time pouring through the record in this case and trying to make sense of the issues. The undersigned does not levy this criticism lightly, and in fact does so reluctantly, but finds it necessary because it is largely the reason for the significant lapse in time between when briefing concluded and the issuance of this decision (*see* Docs. 168, 191, 193).

The Court also wants to stress that although the allegations and some of the evidence in this case raise significant concerns for all inmates in the IDOC who suffer from mental illness, the Court's analysis in this Order must stay within the confines of specific allegations regarding Dontrell. Additionally, the Court's analysis throughout this Order addresses only those arguments made by the parties in their briefs and does not attempt to independently evaluate arguments that may have been available but were not made.[8]

## EVIDENTIARY RULINGS

Along with their requests to exclude Plaintiff's experts, Defendants brought up a

---

[8] *See Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011) ("Neither the district court nor this court are obliged to research and construct legal arguments for parties, especially when they are represented by counsel."); *Alioto v. Town of Lisbon,* 651 F.3d 715, 721 (7th Cir. 2011) ("Our system of justice is adversarial, and our judges are busy people. . . . [T]hey are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning."); *Tyler v. Runyon*, 70 F.3d 458, 465 (7th Cir. 1995) ("The responsibility for the identification, framing, and argument of the issues . . . is that of the lawyers, not that of the judges. . . . So, if [a party] fails to make a minimally complete and comprehensible argument for each of his claims, he loses regardless of the merits of those claims as they might have appeared on a fuller presentation.").

number of other evidentiary challenges. As the party moving to exclude evidence prior to trial, Defendants have the burden of establishing the evidence is not admissible for any purpose. *In re Depakote*, 87 F. Supp. 3d 916, 920 (S.D. Ill. 2015) (quoting *Euroholdings Capital & Inv. Corp. v. Harris Trust & Sav. Bank,* 602 F.Supp.2d 928, 934 (N.D. Ill. 2009)).

## A. CERTIFICATE OF MERIT

Illinois law requires medical malpractice claims to be supported by an affidavit from the plaintiff's attorney and a written report from a qualified, licensed physician who has reviewed the case and determined "there is a reasonable and meritorious cause for the filing of such action." 735 ILL. COMP. STAT. 5/2- 622(a). This report is often referred to as a "Certificate of Merit." Wexford takes issue with the physician's report attached to Plaintiff's Second Amended Complaint, arguing that because Plaintiff has not disclosed the identity of the author nor endorsed the author as an expert in this case, the report is hearsay and should be barred (Doc. 142, pp. 1–2, 23). The statute, however, explicitly provides that the report does not have to identify the physician who authored it, 735 ILL. COMP. STAT. 5/2- 622(a)(1), and furthermore, neither Plaintiff nor her experts cite to or rely on this report in any way (*see* Doc. 173). Therefore, the admissibility of the report is simply not at issue and Wexford's motion as to the § 622 report is denied.

## B. IDOC INVESTIGATIONAL REPORT

Defendants IDOC and John Baldwin argue that the investigational report concerning Dontrell's suicide is inadmissible (Doc. 145, p. 5). Their argument consists of one sentence: "Defendants contend such proposed information and/or testimony is inadmissible based on the fact it is irrelevant, unfairly prejudicial, concerns subsequent

remedial measure(s), and/or in inadmissible hearsay with no applicable exception."
(Doc. 145, p. 5). Despite the brevity and vagueness of Defendants' argument, Plaintiff
provided a thorough response, primarily arguing that the report is admissible under the
hearsay exceptions for business records and/or government reports (Doc. 171, pp. 16–
18). *See* FED. R. EVID. 803(6), (8)(c). In their reply brief, Defendants did not address any of
the arguments made by Plaintiff and simply reasserted in conclusory fashion that the
report is irrelevant and poses a risk of being unfairly prejudicial, confusing the issues,
and/or misleading the jury (Doc. 183, p. 3). Defendants' undeveloped objections do not
provide the Court with enough information to truly understand their position, nor is it
sufficient to carry their burden as the objecting party. The Court further notes that the
Investigational Report is cited to in this Order only for the purpose of recounting the
events on the day of Dontrell's death. The Court does not in any way rely on the Report's
analysis of the "actions and/or inactions of non-parties," which seems to be the heart of
Defendants' concerns (*see* Doc. 183, p. 3). For these reasons, Defendants' objection is
overruled at this time.

## C.  RASHO MATERIALS

*Rasho* is a class action lawsuit against the IDOC officials alleging systemic and
constitutionally deficient mental health treatment at IDOC facilities. *See Rasho v. Jeffreys*,
22 F.4th 703, 706 (7th Cir. 2022) ("*Rasho appeal*"). The parties signed a settlement
agreement in May 2016 requiring the IDOC to meet certain benchmarks across more than
a dozen areas of mental-health treatment. *Id.* The settlement agreement also provided for
the appointment of a monitor, Dr. Pablo Stewart, to evaluate the IDOC's progress,

provide updates, and prepare annual reports. *Id.* at 707. Several months after Dr. Stewart issued his first annual report in June 2017, the plaintiffs moved for and were granted a preliminary injunction. *Id.*; *see also Rasho v. Walker*, No. 07-1298, 2018 WL 2392847 (C.D. Ill. May 25, 2018) ("*Rasho preliminary injunction*"). Shortly thereafter, Dr. Stewart issued his second annual report in June 2018, and the plaintiffs moved for and were granted a permanent injunction. *Rasho appeal*, 22 F.4th at 708; *see also Rasho v. Walker*, 376 F. Supp. 3d 888, 892–93 (C.D. Ill. 2019) ("*Rasho permanent injunction*").

In both of the orders granting injunctive relief, the district court determined that the IDOC was not complying with the terms of the settlement agreement in five particular areas—(1) mental health evaluations; (2) treatment planning; (3) medication management; (4) crisis care and transition; and (5) access to mental health treatment in segregation—and the non-compliance was driven primarily by inadequate staffing. *Rasho permanent injunction*, 376 F. Supp. 3d at 902, 906, 915–16; *Rasho preliminary injunction*, 2018 WL 2392847, at *11. The district court held that as a result of the inadequate staffing, inmates were effectively denied access to constitutionally adequate mental health care. *Rasho permanent injunction*, 376 F. Supp. 3d at 915. The district court further determined that the defendants had been aware of the deficiencies in the five areas of non-compliance for an unreasonable period of time, and their failure to address the deficiencies amounted to deliberate indifference. *Rasho permanent injunction*, 376 F. Supp. 3d at 916, 917.

These rulings, however, were reversed on appeal. *Rasho appeal*, 22 F.4th 703. The Seventh Circuit found that although the IDOC was not providing the level of care prescribed by the settlement, that did not equate to a constitutional violation because

there was "no evidence that the terms of the settlement and IDOC's staffing plan matched the constitutional floor . . . ." *Id.* at 711. But even if the terms of the settlement *did* correspond with Eighth Amendment minimums, the defendants were not deliberately indifferent because they "made reasonable efforts to cure the deficiencies in the five areas identified in the plaintiffs' claim and to alleviate the staffing shortage," even though they were ultimately unsuccessful in achieving their goals. *Id.* at 710, 711. Critically, the Seventh Circuit explained that the actions taken by IDOC administrators "demonstrate[d] a commitment to addressing the problem," which is "the antithesis of the callous disregard required to make out an Eighth Amendment claim." *Id.* at 710.

### 1. Use of *Rasho* Materials in This Case

In the instant action, Plaintiff seeks to use various materials from the *Rasho* litigation to establish disputes of material fact and/or impute knowledge to Defendants (*see* Doc. 173). In particular, Plaintiff cites to (1) transcripts from the preliminary injunction hearing (*Rasho* docket entries 1757–1758 and 1903–1906) (Doc. 173, pp. 2–22, 24); (2) transcripts from the permanent injunction hearing (*Rasho* docket entries 2354 and 2370–2377) (Doc. 173, pp. 2–22, 24); (3) the district court order granting permanent injunctive relief (*Rasho* docket entry 2460) (Doc. 173, p. 11); (4) Dr. Stewart's First Annual Report from May 2017 (*e.g.,* Doc. 173, p. 27; Doc. 165-31); and (5) Dr. Stewart's Mid-Year Report from November 2017 (*e.g.,* Doc. 173, pp. 19, 25; Doc. 165-32).

Wexford takes the blanket approach that any and all of the *Rasho* documents are inadmissible because they "constitute irrelevant, inadmissible hearsay and . . . lack proper foundation" (Doc. 142, pp. 4–6). Similarly, the IDOC argues that all of the *Rasho*

documents are inadmissible because they are hearsay, irrelevant, unfairly prejudicial, and/or concern a subsequent remedial measure (Doc. 144, p. 17).

Plaintiff, however, contends that the transcripts are the equivalent of affidavits and are therefore appropriate evidence to consider on summary judgment (Doc. 173, pp. 23–25). Indeed, the Seventh Circuit has instructed that "depositions from one case may be used at the summary judgment stage of another" if two conditions are met. *See Alexander v. Casino Queen, Inc.*, 739 F. 3d 927, 978 (7th. Cir. 2014). First, the deposition testimony must satisfy Rule 56's requirements for an affidavit, meaning the testimony is based on personal knowledge and sets out facts that would be admissible at trial, and the deponent is competent to testify on these matters. *Id.* Second, "the depositions from the other case must be part of 'the record' in the present case[.]" *Id.* Both conditions appear to be satisfied here, which Defendants do not dispute (*see* Docs. 180–183). Consequently, the transcripts from *Rasho* will not be excluded at this juncture.

As for the *Rasho* district court's order granting preliminary injunctive relief, Plaintiff seeks to use it to establish a material issue of fact that John Baldwin acted with deliberate indifference (*see* Doc. 173, p. 11). As a general matter, one district court's decision may be persuasive but it is not binding on another district court. *Townsel v. DISH Network L.L.C.*, 668 F.3d 967, 970 (7th Cir. 2012) ("[D]istrict courts' decisions are not authoritative, even in the rendering district (other district judges may disagree)"). But more importantly, the *Rasho* district court's finding of deliberate indifference was overturned by the Seventh Circuit. *Rasho appeal*, 22 F.4th at 710–11. For these reasons, the *Rasho* district court's order is excluded as evidence in this matter.

Last but not least, Dr. Pablo Stewart's reports. The Seventh Circuit has repeatedly held that reports of this sort are inadmissible hearsay and thus their contents cannot be offered for the truth of the matter asserted. *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 617 (7th Cir. 2022); *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 232 (7th Cir. 2021); *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 522 (7th Cir. 2019); *Daniel v. Cook Cnty.*, 833 F.3d 728, 743 (7th Cir. 2016). Plaintiff nevertheless argues these reports should come in under the hearsay exception in Federal Rule of Evidence 807 (Doc. 173, pp. 25–28). In the alternative, Plaintiff argues that the Court should take judicial notice of the contents of the reports and/or admit them for the limited purpose of establishing notice (*Id.* at pp. 28–30). The Court need not make a decision as to whether these reports are admissible for any purpose, however, Plaintiff cannot defeat summary judgment with or without the reprots, as explained in depth later in this Order.

## D.  PLAINTIFF'S EXPERT REPORTS

The admission of expert testimony is governed by Federal Rule of Evidence 702 and the principles announced by the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017). *See also Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013) (explaining that the general standards derived from *Daubert* are "essentially codified in the current version of Rule 702" and *Daubert* "remains the gold standard for evaluating the reliability of expert testimony") (citation omitted); *accord Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 n.1 (7th Cir. 2017).

Under Rule 702, expert testimony is admissible if (1) the witness is qualified as an

expert by knowledge, skill, experience, training, or education; (2) the witness's specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the witness has applied the principles and methods reliably to the facts of the case. FED. R. EVID. 702. In short, Rule 702 "requires the district court to act as an evidentiary gatekeeper," *Krik*, 870 F.3d at 674 (citing *Daubert*, 509 U.S. at 589), to ensure that expert witnesses are qualified to give the opinion they seek to offer and that their testimony "is not only relevant, but reliable." *Manpower*, 732 F.3d at 806 (quoting *Daubert*, 509 U.S. at 589). It is "a flexible standard with broad discretion given to district court" to determine the admissibility of the expert opinion testimony. *Krik*, 870 F.3d at 674 (citations omitted). In determining relevance and reliability, the party offering the expert testimony bears the burden of proof. *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014) (citing *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009)).

The Court did not conduct a hearing on the *Daubert* motions because the record is adequate to decide the motions without one. Additionally, the parties did not indicate a hearing was necessary or set forth what missing information a hearing would supply. *See Niam v. Ashcroft*, 354 F.3d 652, 660 (7th Cir. 2004) ("[A] *Daubert* hearing is [not] always required**.**"); *Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998) (no automatic entitlement to a *Daubert* hearing because the Seventh Circuit has "not required that the *Daubert* inquiry take any specific form").

1.  **Michael Brady**[9]

Michael Brady was retained by Plaintiff as an expert in corrections from an administrative and operational standpoint. He worked as a public policy consultant for the California state legislature on mental health issues and operational problems in corrections, amongst other things (Doc. 142-1, pp. 108–14; *see also* Doc. 145-2, pp. 9–106). He then spent over a decade with the California Department of Corrections, serving in rank-and-file and executive-level positions. Following his retirement from the Department of Corrections, Brady worked as a consultant for approximately ten years, advising federal, state, and local governments on running cost effective and constitutionally adequate prison, jail, parole, parole board, and probation operations— focusing specifically on ADA compliance, health care provision, suicide prevention, and restrictive housing, among other things.[10] He also served as an independent or neutral expert and court-appointed monitor in multiple class actions involving state correctional systems in various states.

Mr. Brady stated in his report that he was asked to render an expert opinion as to whether the following things contributed to Dontrell's death: (1) the IDOC's failure to comply with the *Rasho* settlement agreement; (2) staffing shortages; and (3) violations by IDOC correctional officers and Wexford mental health professionals of the IDOC's

---

[9] Mr. Brady's original report, CV, and supplemental report are at Doc. 142-1, pp. 54–115. Another copy of just the original report is at Doc. 145-1. In this version, the page numbers imprinted by CM/ECF at the top of the pages match the original page numbers at the bottom. Therefore, for the sake of ease and clarity, this is the version that the Court primarily cites to throughout this Order. The transcript of Brady's deposition testimony is at Doc. 142-3 and Doc. 145-2.

[10] Mr. Brady sadly passed away during the pendency of this case.

policies and procedures specifically designed to prevent suicides by inmates housed in segregation housing (Doc. 145-1, pp. 2–3).

In forming his opinions and preparing his report, Mr. Brady reviewed an extensive number of documents from *Rasho* and spent approximately 21 pages—about half of his report—recapping the district court record from *Rasho* (Doc. 145-1, pp 3–5, 7–28). Mr. Brady also reviewed Dontrell's IDOC records, including his medical file, his disciplinary file, the autopsy, the psychological autopsy, and the IDOC's investigational report into his death (*Id.* at pp. 3–5).

Mr. Brady's overarching opinions, as summarized here by the Court, were that:

- The IDOC and Wexford had been aware for years, by virtue of the *Rasho* litigation, that the mental health delivery system in the IDOC was "dangerously deficient" (Doc. 145-1, pp. 48, 49). The IDOC and Wexford were likewise aware that the systemic deficiencies created a substantial risk of harm to mentally ill inmates, particularly those in segregation (*Id.*). But the IDOC and Wexford were indifferent to the risk of harm and failed to comply with the terms of the *Rasho* settlement agreement or otherwise provide the minimum level of mental health care for inmates (*Id.* at pp. 47, 48, 49–50, 53). This indifference was a "major contributing factor in the suicide of [Dontrell]." (*Id.* at p. 50).

- Correctional officers were derelict in their duties on the morning of Dontrell's death by failing to ask a mental health professional to speak with him and failing to properly conduct the required 30-minute safety checks (*Id.* at pp. 51–53). Their misconduct was a major contributing factor in Dontrell's suicide (*Id.* at p. 53).

- Dontrell was placed in segregation due to his disability, he was denied services in segregation, and Defendants failed to provide him with reasonable accommodations for his disability (*Id.* at p. 54).

Defendants collectively make a multitude of arguments as to why Mr. Brady's

report should be excluded, including (but not limited to) that he impermissibly relied on *Rasho,* he offered opinions outside the scope of his expertise, his opinions were based on insufficient facts and inadmissible evidence, and he did not apply a reliable methodology in reaching his opinions (Doc. 142, pp. 2, 4–8, 10–14; Doc. 145, pp. 4–8). For the reasons set forth below, the Court agrees that Mr. Brady's report must be excluded.

The Court turns first to Mr. Brady's opinion that Dontrell's death resulted from the systemic deficiencies in the IDOC's mental health care system. The Court assumes for now that the deficiencies Mr. Brady identified did actually exist. Specifically, Brady opined that the IDOC was non-compliant in the five specific areas of the settlement agreement identified in *Rasho*, which resulted in a backlog of evaluations, inadequate and perfunctory treatment plans, inadequate medication management, inadequate crisis treatment and transition, and lack of access to mental health treatment for inmates in segregation (Doc. 145-1, p. 48). Brady further indicated the most fundamental issue underlying the IDOC's non-compliance was the persistent failure to maintain adequate psychiatry and mental health staff (*see id.* at pp. 47, 48–49; *see also id.* at pp. 9–11, 19–22).

From there, Brady opined that the various systemic deficiencies rendered the mental health care provided to inmates in the IDOC constitutionally inadequate, to which Defendants were deliberately indifferent. However, Brady did not employ a reliable methodology—or really any methodology—in reaching these opinions. Instead, he relied solely on the findings of the district court and court-appointed monitor in *Rasho* in formulating his "opinions." (Doc. 145-2, p. 190; *see also id.* at pp. 110, 132, 145–46, 168–69, 208, 216, 236–37, 239, 278–79). He did not review any of the underlying data (other than

what was in the monitor's reports) or conduct any independent analysis of that data (*see* Doc. 145-2, pp. 107–09, 110, 190, 208). He did not do any investigation of his own or obtain any additional data (*see id.*). He did not critically evaluate the *Rasho* monitor's findings or the *Rasho* court's conclusions, nor offer a reaction or an independent assessment of those findings based on his own experience and expertise *(see id.*). Rather, Brady blindly adopted the conclusions of a federal judge as his own "opinions."[11] In short, there is nothing that indicates Brady employed any of his own experience or expertise to formulate any sort of opinion of *his own* regarding the adequacy of the mental health services in the IDOC and Defendants' response.

"[T]he entirety of an expert's testimony cannot be the mere repetition of 'the out-

---

[11] In fact, in more than one instance during his deposition, Brady made clear that he did not know the meaning of, or the reasoning behind, a particular district court finding that he included in his report and adopted wholesale as his own opinion (*see* Doc. 145-2, pp. 132–33, 218–19).

In one instance, the following exchange took place:
Q: Back to your report on page six. You discuss, "There is systemic and gross deficiencies in staffing facilities, equipment and procedures?"
A: Yes, I took that out of the judge's findings.
Q: So you're relying on Rasho for those –
A: Yes.
Q: -- findings? Do you know what equipment is being referred to here?
A: I do not. (Doc. 145-2, pp. 132–33).

In another instance, defense counsel was discussing actions that John Baldwin and the IDOC took after the execution of the settlement agreement, including efforts to address staffing and trainings offered to IDOC employees, and the following exchange took place:
Q: And, again, that would be indicative of the fact that they were making attempts to correct these things, and not turning a blind eye or being deliberately indifferent?
A: Well, it's hard for me to substitute my judgment for that of the court, but I think -- I could acknowledge, based on the testimony, that he's making efforts. For whatever reason, the court decided that those efforts still did not absolve him of the finding of deliberate indifference, but I can't go behind what the court thinking is. I only know the court came to the conclusion based on the testimony. Maybe it was the length of time. I'm not sure. (Doc. 145-2, pp. 215–18).

of-court statements of others . . . .'" *United States v. Brownlee*, 744 F.3d 479, 482 (7th Cir. 2014)) (citations omitted). "An expert who parrots an out-of-court statement is not giving expert testimony; he is a ventriloquist's dummy." *Id. Accord Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) ("Rule 703 'was not intended to . . . allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.'" (quoting *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794, 808 (N.D. Ill. 2005))); *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) ("While it is true that an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts . . . such expert must make some findings and not merely regurgitate another expert's opinion."); *See also Schoen v. State Farm Fire & Cas. Co.*, No. CV 21-00264-JB-N, 2022 WL 16579767, at *6 (S.D. Ala. Nov. 1, 2022) (collecting cases in which experts were excluded for parroting the opinions of other experts or wholesale adopting other experts' opinions without independent analysis).

Mr. Brady's reliance on the district court's findings in *Rasho* regarding the constitutional inadequacy of the mental health care system and the IDOC's deliberate indifference is even more problematic in this instance because, as previously explained, those findings were *reversed* by the Seventh Circuit. Mr. Brady did not divulge or describe any basis independent of the district court's findings that could be used to salvage his opinions. In fact, his deposition testimony made clear that there was no basis for his opinions other than the *Rasho* court's now-overturned findings. For example, he did not consult or formally rely on any national standards, statutes, regulations, and/or relevant

case law regarding what level of care was constitutionally required, or even what constituted best practice (Doc. 145-2, pp. 190–91). He had no information regarding Defendants' actions to address the deficiencies in care following the settlement agreement (*Id.* at pp. 214, 215–219). And he did not have an opinion as to the timeframe in which Defendants should have fully satisfied the terms of the settlement agreement, but acknowledged that such large-scale, systemic changes may take years to implement (*Id.* at pp. 198–200).

For these reasons, Brady's opinions as to the unconstitutionality of the IDOC mental health care system as a whole and Defendants' deliberate indifference must be excluded.

Mr. Brady's opinion that the systemic deficiencies affected the care Dontrell received in the IDOC and contributed to his death must also be excluded because he did not employ an identifiable or reliable methodology in formulating this opinion. Mr. Brady's report discusses problems with the IDOC generally but conspicuously does not connect those problems to Dontrell's personal experience in any way, shape, or form. "It is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). "[E]xperts cannot offer opinions based merely on their say-so." *Smith v. Nexus RVs, LLC*, 472 F. Supp. 3d 470, 480 (N.D. Ind. 2020) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999)). *See Kumho*, 526 U.S. at 137 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the

expert.") (citation omitted). Rather, the expert's report must be "complete and detailed" and set forth the "basis and reasons" for their opinions and conclusions. *Ciomber v. Cooperative. Plus,* 527 F.3d 635, 641 (7th Cir. 2008) (citing FED. R. CIV. P. 26(a)(2)(B)(i)). *See also Salgado v. General Motors,* 150 F.3d 735, 741 n.6 (7th Cir. 1998) ("A complete report must include the substance of the testimony which an expert is expected to give on direct examination together with the reasons therefor . . . . [It] must include 'how' and 'why' the expert reached a particular result, and not merely the expert's conclusory opinions."). The expert's opinion must offer more than a 'bottom line.'" *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010) (quoting *Wendler & Ezra, P.C. v. Am. Int'l Group, Inc.,* 521 F.3d 790, 791 (7th Cir. 2008) (per curiam)). "An expert who supplies nothing but a bottom-line supplies nothing of value to the judicial process." *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791–92 (7th Cir. 2008) (internal citations omitted). *See also Mamah*, 332 F.3d at 478 ("As we have observed, 'experts' opinions are worthless without data and reason.'") (citation omitted).

To begin with, Brady focused heavily on inadequate staffing, which he characterized as the biggest problem and the root of all the other deficiencies with the mental health care system (*see* Doc. 145-1, p. 47, 48, 49). But his statements regarding inadequate staffing were made with respect to the IDOC system as a whole (Doc. 145-2, pp. 208–09). He never discussed staffing levels at Lawrence specifically (*see* Doc. 145-1); in fact, he never reviewed *any information* regarding such (Doc. 145-2, pp. 122–24, 167–72). He did not know how many offenders were at Lawrence, how many offenders were on the mental health caseload, or the number of mental health professionals and

psychiatrists needed for Lawrence to be "fully staffed" (Doc. 145-2, p. 122). He only knew that one of Pablo Stewart's reports in *Rasho* indicated that Lawrence had a psychiatric vacancy and MHP vacancies (Doc. 145-2, pp. 122–24, 255). But Brady did not elaborate any further on the significance of those vacancies and whether they had any constitutional implications. It is clear that Brady's opinion that inadequate staffing contributed to Dontrell's death is purely an assumption and is not based on any actual data (*see also* Doc. 145-2, pp. 169-71, 171–72).

Similarly, with respect to the specific systemic deficiencies in the mental health care delivery system identified in *Rasho*, Brady did not evaluate whether Lawrence was non-compliant in each of those five areas. As a matter of fact, he testified that he did not have enough information to do so, and he could not extrapolate that Lawrence was non-compliant from determinations regarding any other facility or the IDOC system as a whole (145-2, pp. 207–09, 239). Brady also did not explain how the five specific systemic deficiencies were manifested in the care that Dontrell personally received or led to his death (*see* Doc. 145-1, pp. 47–54). Brady seemed to take the position that the deficiencies in the IDOC's mental health services were so severe and pervasive that Dontrell must have been impacted. But this opinion regarding causation amounts to nothing more than an inferential leap, untethered from any explanation or facts regarding Dontrell's own personal experience. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (expert testimony cannot "be based on subjective believe or speculation.").

For instance, Brady said nothing about the treatment Dontrell received on crisis watch, such as the number of contacts, who he saw, etc. (*see* Doc. 145-1, pp. 28–54). Brady

stated in a conclusory fashion that Dontrell was not given "proper evaluations," but he did not identify any specific issues or problems with the evaluations (*e.g.,* the timing of the evaluations, who conducted them, what they contained, etc.) to support that opinion (*see id.* at p. 54).[12]  Brady did not point out any deficiencies in Dontrell's treatment plans; in fact, he made no mention of them at all in the "Expert Opinions" section of his report (*see id.* at pp. 47–54).[13]  Brady likewise made no mention of medication management in the "Expert Opinions" section of his report (*see id.*).[14]  Finally, Brady stated in a conclusory fashion that Dontrell was deprived of mental health services and programming in segregation, but again, never specified what those services or programs were (*see id.*). What is more, Brady acknowledged at his deposition that group therapy was provided to inmates in segregation at Lawrence, which Dontrell "actively participated in" (Doc. 145-2, pp. 118, 119, 177, 186). Even more crucially, Brady admitted that Dontrell had "sufficient" and "appropriate" number of contacts with mental health providers "in the weeks leading up to his death" (*Id.* at p. 144). This, of course, suggests Dontrell was not deprived of any services while in segregation that were necessary to achieve the level of

---

[12]  Elsewhere in his report, Brady indicated that in the 90 days before Dontrell's death, there was "only one psychiatric evaluation, which was performed by a psychiatrist assistant" (Doc. 145-1, p. 33). To the extent this statement implies something else was required, Brady failed to identify what that was or elaborate any further (*see* Doc. 145-1).

[13]  Elsewhere in his report, Brady stated that Dontrell's "Mental Health Treatment Plan updates were completed by MHP or the Psychiatrist Assistant" (Doc. 145-1, p. 33). To the extent this statement implies something else was required, Brady did not identify what that something was (*see* Doc. 145-1).

[14]  Elsewhere in his report, Brady indicated that Dontrell rarely took his morning medications (Doc. 145-1, p. 32). But that is basically all he said. He did not indicate what medications he was talking about, what conditions they were intended to treat, or what (if anything) the mental health and/or medical staff did to address the issue (*see* Doc. 145-1).

care required by the Constitution. In sum, Brady failed to connect the dots between the systemic deficiencies that existed in the IDOC as a whole and the personal experience of Dontrell and his ultimate death. This opinion is therefore excluded.

Next, Brady discussed the failures of Officers Goble and Givens on the day of Dontrell's death and opines that these failures were major contributing factors to Dontrell's death (Doc. 145-1, pp. 51–53).[15]  But this case is not about the individual failures of any particular person. Plaintiff made the conscious decision to frame this case as one about systemic failures. Brady opines in a wholly conclusory fashion that the officers' failures "are consistent with and the result of the long-term systemic failures" of the IDOC, John Baldwin, and Wexford's conscious indifference to the mental health needs of inmates (*id.* at p. 53). But he never mentioned the failure to follow the IDOC's suicide prevention policies as one of the systemic problems plaguing the IDOC (*see* Doc. 145-1). Nor did Brady discuss any evidence of other instances where this failure occurred (*see id.*). Furthermore, Plaintiff does not contend that the specific officers' (in)actions on the day of Dontrell's death were part of a systemic problem (*see* Doc. 173, pp. 30–62). Consequently, Brady's opinion regarding the failures of Officers Goble and Givens must be excluded as irrelevant, unreliable, and unlikely to assist a trier of fact in any way.

Finally, the Court turns to Mr. Brady's opinions that pertain to Plaintiff's ADA and Rehab Act claims. These opinions seem to have been tacked onto the end of his report as

---

[15] He also claims that Leann Hartleroad was guilty of the same failures (Doc. 145-1, pp. 51–53). However, it was clarified at his deposition that he was under the mistaken impression that Hartleroad was a correctional officer when really she is an MHP (Doc. 145-2, pp. 186–87).

an afterthought and consist of only the following four sentences (*see* Doc. 145-1, p. 54):

> IDOC, [Wexford], and Baldwin knew that [Dontrell] was disabled by way of his mental health condition, and they owed him benefits, programs, and services because of that disability. Placement in segregation denied him services, and the placement was due to his disability. They failed to provide him with reasonable accommodations because of that disability. Their practices created a disparate impact on [Dontrell].

At his deposition, Brady initially forgot about these opinions, testifying that he was not asked to form an opinion as to the IDOC's compliance with the ADA and agreeing that his report had nothing to do with the ADA (Doc. 145-2, p. 207). It was only after Brady was reminded by Plaintiff's counsel that the complaint contained claims for violations of the ADA and Rehab Act, that he remembered he had opined that both statutes had been violated (*Id.* at pp. 260–61). And it was only after he was repeatedly pressed by defense counsel as to what his opinions were based on that he finally gave actual, concrete reasons (*Id.* at pp. 283–84). But even then, he was not able to offer a full explanation of the "basis and reasons" for his opinions (*see id.* at pp. 283–90).

Under Rule 26(a)(2), Plaintiff was required to furnish by the date set forth in the scheduling order Mr. Brady's report "containing, among other information, 'a complete statement of all opinions' . . . '*and the basis and reasons for them.*'" *Ciomber*, 527 F.3d at 641 (quoting FED. R. CIV. P. 26(a)(2)(B)(I), (a)(2)(C)) (emphasis added). While an expert report does not have to "replicate every word that the expert might say on the stand," it must "convey the substance of the expert's opinion . . . so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010) (quoting *Walsh v. Chez*, 583 F.3d 990,

994 (7th Cir. 2009)). Brady's terse opinions in his report regarding the ADA and Rehab Act are the type of undeveloped and deficient expert opinions that fail to convey the substance of the opinions and adversely affect opposing counsel's ability to depose the expert. *Ciomber*, 527 F.3d at 641, 642 ("Rule 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony . . . to provide information they should have initially included in their Rule 26(a)(2) report.") (citing *Salgado v. General Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998)). Consequently, Mr. Brady's opinions regarding the ADA and Rehab Act must be excluded.

In conclusion, Defendants' motion to exclude the expert report and testimony of Michael Brady is granted and Brady's report is excluded in its entirety.

### 2.   Sanjay Adhia, M.D.[16]

Dr. Sanjay Adhia is Plaintiff's other expert witness. He is a board-certified physician in psychiatry, brain injury medicine, and forensic psychiatry (Doc. 142-1, p. 47). Dr. Adhia has worked as a practitioner and an educator, as well as an advisor/committee member with the Governor's Advisory Committee to the Texas Board of Criminal Justice on Offenders with Medical or Mental Impairments and the American Academy of Psychiatry and the Law (*Id.* at pp. 47–50; Doc. 142-2, pp. 28–29, 93–94). Dr. Adhia has treated patients in a prison and also a jail, as well as other facilities associated with the legal-correctional system, such as state hospitals and a competency restoration unit, and he is familiar with assessing suicide risk (Doc. 142-2, pp. 42, 46–72, 95; *see* Doc. 142-1, p.

---

[16] Dr. Adhia's original report, CV, and supplemental report are at Doc. 142-1, pp. 1–53. Another copy of just his original report is at Doc. 145-3. The transcript of his deposition testimony is at Doc. 142-2.

48). He has also prepared expert reports and offered opinions regarding adequate care at correctional centers on multiple occasions (Doc. 142-2, pp. 23–25).

Dr. Adhia did not specify in his report what type of opinions he was retained to provide (*see* Doc. 142-1, pp. 1–53). As the Court sees it, Dr. Adhia was retained to opine on Dontell's mental health generally, the quality of the mental health care Dontrell received, and whether any deficiencies in his care were consistent with the systemic deficiencies identified by Michael Brady and the *Rasho* proceedings.

As with Mr. Brady, Defendants make a multitude of arguments as to why Dr. Adhia's report should be excluded, including that he impermissibly relied on *Rasho*, he offered opinions outside the scope of his expertise, his opinions were based on insufficient facts and inadmissible evidence, and he did not apply a reliable methodology in reaching his opinions (Doc. 142, pp. 2, 8–9, 15–23; Doc. 145, pp. 3, 10–11). Dr. Adhia's report is unlike any report the undersigned has ever seen from a retained expert medical professional and agrees that a host of problems require the report to be excluded.

As a general matter, the Court has concerns as to whether Dr. Adhia 's report was actually prepared by him, as required by Rule 26(a)(2)(B). Dr. Adhia testified that by the time his report was finished, he had spent 13 hours working on the case (Doc. 142-2, p. 98). Yet his report is 46 pages long, and he claims to have reviewed nearly 5,000 pages of documents specific to Dontrell's care and treatment, along with thousands of pages of documents from *Rasho* (Doc. 142-1, pp. 44–46; *see also* Doc. 171, p. 29).[17] The Court finds

---

[17] In comparison, Michael Brady testified that he spent 40-60 hours reviewing documents and another 40 hours preparing his report (Doc. 145-2, pp. 5–7)

it highly unlikely this extensive amount of work could be completed in just 13 hours.

Additionally, the contents of Dr. Adhia's report were almost entirely lifted from Michael Brady's report. The body of Dr. Adhia's report (from the "Introduction" on page 2 to the end of his "opinions" on page 44) is roughly 43 pages long (*see* Doc. Doc. 142-1, pp. 1N53). Of those 43 pages, approximately one page is original content (*see id.* at pp. 42–43). Just 14 sentences. The rest was copied verbatim from Michael Brady's report (save for some typos that were corrected and some minor word insertions, deletions, and/or modifications), including most of the actual substantive "Opinions" section.

The problem with copying and pasting from Brady's report is that the information Brady was concerned with as a correctional administrator/expert is very different from the information that would be relevant to Dr. Adhia. As a result, large swaths of the information in Dr. Adhia's report are entirely irrelevant to his purposes. For example, Dr. Adhia spent five and a half pages recounting inmate and staff interviews, which were done as part of the IDOC's investigation into Dontrell's death and were aimed at determining whether Dontrell asked to speak to a crisis team and threatened to harm himself on the day of his death and how the correctional officers responded (Doc. 142-1, pp. 27–33). This information has little to no bearing on the opinions Dr. Adhia was retained to provide. Dr. Adhia then copied Mr. Brady's opinion that correctional officers were derelict in their duties on the day of Dontrell's death (Doc. 142-1, p. 41), which is certainly not the type of opinion he was retained to provide.

While Dr. Adhia spent over five pages recounting irrelevant information, when it came to recounting Dontrell's mental health care, he was shockingly brief. He simply

copied and pasted the summary that Michael Brady provided and did not attempt to add any additional details about Dontrell's evaluations, treatment plans, medications, contacts with MHPs or psychiatric staff, etc. One would think that an expert psychiatrist would not only be interested in the details of these encounters, but that the details would be essential to providing an opinion. As an example, Dr Adhia gave a very hasty summary of Dontrell's mental health care records during the final 90 days of his life, which is the period most critical to this lawsuit (Doc. 142-1, p. 26). He stated:

> During [Dontrell's] final 90 days of life, he was placed on crisis watch on at least four occasions. He was evaluated for suicide potential by MHP staff . . . multiple times—once requesting crisis placement which was denied—but the records show only one psychiatric evaluation, which was performed by a Psychiatric Assistant. His Mental Health Treatment Plan updates were completed by MSP of the Psychiatrist Assistant . . . and reflected diagnosis such as "Other Specified Disruptive, Impulse Control, and Conduct D/O w/ Mixed Emotions & Conduct" [and] "Adjustment Disorder with Disturbance of Conduct and Emotion" or "crisis," omitting his specific diagnoses of Bipolar Disorder and Schizophrenia.

(Doc. 142-1, p. 26). That's it. Approximately 100 pages of mental health records reduced to just three sentences. No additional details, context, comments, or criticisms. In dramatic contrast, Wexford's expert psychiatrist's summary of the same mental health records is almost four, single-spaced pages long (Doc. 142-4, pp. 2–10).

Unfortunately, Dr. Adhia's deposition testimony was just as problematic as his report. The Court agrees with Wexford that his testimony shows he was "unclear on his own opinions and startlingly unfamiliar with the records" (Doc. 181, p. 4). He could not recall what documents he reviewed, background information integral to his report, basic information related to Dontrell's incarceration and care, or the specifics of his own

opinions. A few examples include:

- Dr. Adhia could not recall the five areas of the settlement agreement in which the IDOC was found non-compliant in *Rasho* (Doc. 142-2, pp. 115–16, 166–67, 170–71), even though almost 20 pages of his report were dedicated to this exact information (*see* Doc. 142-1, pp. 5–23).

- He could not recall whether he reviewed Dr. Stewart's November 2017 report or relied on any of its findings, (*Id.* at pp. 171–75), which is incredible as this document is particularly noteworthy given that it specifically analyzed the mental health care system at Lawrence during the time that Dontrell was there.

- Dr. Adhia could not recall if he had reviewed Dontrell's disciplinary records (Doc. 142-2, pp. 156–57).

- He had no idea where Dontrell's purported diagnosis of bipolar disorder or schizophrenia originated (Doc. 142-2, pp. 151, 251).

- He could not remember how much time Dontrell spent out of his cell and/or participating in group therapy (Doc. 142-2, pp. 206–07; *see also id.* at pp. 155–56).

- He could not recall anything about the treatment Dontrell received or his contacts with MHPs at significant times, such as after he made his bedsheet into a noose in September 2017, during his last placement on crisis watch in late October 2017, or in the days immediately preceding his death (Doc. 142-2, pp. 137–41, 154, 164–65).

All of these circumstances beg the question whether the opinions are truly those of the expert, as required by Rule 26(a)(2)(B). Even if that weren't the case, Dr. Adhia's report would still be deficient. It inexplicably does not contain the words "standard of care" insofar as it relates to Dontrell's care (*see* Doc. 142-1).[18] There are no other

---

[18] Dr. Adhia actually said "standard of care" one time in his entire 40-plus page report, and it was in reference to the witness testimony in the *Rasho* case (Doc. 142-1. at p. 6). He never used that phrase in reference to Dontrell's care (*see id.*)

statements in the report that could be interpreted as coherently providing a standard of care for the mental health professionals and psychiatric staff employed by Wexford (*see id.* at pp. 24–44). Likewise, there is nothing that even remotely speaks to a standard of care for Wexford as an organization in terms of institutional liability (*see id.*).

Additionally, when it comes to actions/inactions by Wexford employees that Dr. Adhia took issue with, they were identified in a conclusory fashion with no supporting explanation or facts (Doc. 142-1, pp. 39–44). As one example, Dr. Adhia opined "[t]here was a lack of evaluation, care, and treatment of [Dontrell], despite his known problems," but he did not bother to explain what was wrong with the treatment Dontrell did receive and/or what additional evaluations, care, and treatment Dontrell should have gotten. As already explained above, Rule 26 requires more. Dr. Adhia also did not intelligibly explain how any of the actions/inactions caused or contributed to Dontrell's death to a "reasonable degree of medical certainty" (*see* Doc. 142-1). In fact, those words are never mentioned in his report (*see id.*).

Dr. Adhia's report and testimony is so deficient on its face that it cannot be considered reliable or likely to assist a trier of fact in any way (and his deposition testimony was no better). As a result, his report and his opinions are excluded in their entirety.

As a final note, to the extent that Plaintiff contends Dr. Adhia offered opinions that the ADA and Rehab Act were violated, these opinions are also excluded. They consist of nothing more than the same four conclusory sentences that were tacked on to the end of Mr. Brady's report (*see* Doc. 142-1, p. 44; Doc. 145-1, p. 54). They are unsupported by any

facts or explanation whatsoever (*see* Doc. 142-1, p. 44). And Dr. Adhia offered absolutely no testimony regarding the ADA or the Rehab Act at his deposition (*see* Doc. 142-2).

## MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper when the moving party "shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Under Rule 56, the movant has the initial burden of informing the court why a trial is not necessary. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). When the movant does not bear the burden of persuasion on a particular issue at trial, like Defendants in this case, the movant is not required to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Modrowski*, 712 F.3d at 1168 (citation omitted; emphasis in original). Rather, the movant can discharge their initial burden by pointing out to the court that there is an absence of evidence to support the nonmovant's case. *Id.*

The party opposing summary judgment, in this case Plaintiff, bears the burden of coming forward with properly supported arguments or evidence to show the existence of a genuine issue of material fact." *Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th Cir. 2006). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted).

In deciding a motion for summary judgment, the court "must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014). The court need only consider the cited materials, but it may consider other materials in the record. FED. R. CIV. P. 56(c)(3). However, the Seventh Circuit has repeatedly stressed that courts are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *E.g., Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572–73 (7th Cir. 2017).

DISCUSSION

The Court will first address the deliberate indifference claim against John Baldwin and then the negligence claim against him. After that, the Court will address those same claims against Wexford but in reverse order. And lastly, the Court will address the ADA/Rehab Act claims.

**A.  CLAIMS AGAINST JOHN BALDWIN**

**1.  Deliberate Indifference (Count 1)**

A prison official who acts with deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Eagan v. Dempsey*, 987 F.3d 667, 693 (7th Cir. 2021) (citing *Farmer v. Brennan,* 511 U.S. 825, 828 (1994)). To succeed on her deliberate indifference claim, Plaintiff must first show that "the harm that befell" Dontrell was "objectively, sufficiently serious and a substantial risk to his . . . health or safety." *Eagan*, 987 F.3d at 693. Plaintiff must then show that Defendant was deliberately indifferent to the substantial risk and that Defendant's deliberate indifference injured

Dontrell. *Id.*; *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 614 (7th Cir. 2022). *See also Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 489 (7th Cir. 2022) (noting the plaintiff failed to provide evidence that chronic understaffing at the health care unit harmed him); *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (succeeding on a § 1983 claim requires the plaintiff to show the defendant's deliberate indifference caused her some injury).

The first, objective element is not disputed here, (*see* Doc. 141, Doc. 144), as "it goes without saying that suicide is a serious harm." *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006) (quotation omitted); *accord Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 565 (7th Cir. 2021). *See also Sanville v. McCaughtry,* 266 F.3d 724, 733 (7th Cir. 2001) ("The need for a mental illness to be treated could certainly be considered a serious medical need."); *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) ("Treatment of the mental disorders of mentally disturbed inmates is a "serious medical need."). The parties' dispute centers on whether Baldwin was deliberately indifferent. Deliberate indifference "is a subjective mental state; the official must have actually known of and consciously disregarded a substantial risk of harm." *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) ("*Rasho appeal*") (citing *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc)). "This is a high bar 'because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rasho appeal*, 22 F.4th at 710 (quoting *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)). Mere negligence, or even gross negligence, will not suffice. *Lisle v. Welborn*, 933 F.3d 705, 717 (7th Cir. 2019).

In this case, Plaintiff made the choice not to advance claims against individual

MHPs, psychiatric providers, or correctional officers like Goble and Givens.[19] Nor did she sue the individuals in charge at Lawrence Correctional Center where Dontrell was incarcerated, such as the warden or the medical director. Instead, she chose to frame this individual action concerning her son's death as a case about systemic deficiencies within the IDOC in an effort to hold those at the highest level accountable. As a result, Plaintiff's claims are against the individual in charge of the *entire* IDOC and the entity in charge of its medical services, system wide: John Baldwin and Wexford Health Sources. Plaintiff contends that Dontrell's death was the result of systemic problems in the IDOC's mental health care system, to which Baldwin and Wexford were deliberately indifferent.

In her brief, Plaintiff never laid out in a clear, orderly fashion the systemic problems that existed in the IDOC that she believes affected Dontrell's care. Instead, she sprinkles references to various problems throughout her brief. The Court has done its best to collect those references here and outline the various systemic issues that Plaintiff had identified or at least alluded to, including:

- inadequate services on crisis watch (Doc. 173, pp. 3, 46);
- inadequate mental health services for mentally ill offenders in segregation (*Id.* at pp. 13, 37, 46, 51);
- issues with records, such as incomplete records and cut-and-pasted records (*Id.* at pp. 10, 19);
- improper medication management (*Id.* at pp. 21, 36);
- inadequate staffing (*Id.* at pp. 21, 47);
- insufficient psychiatric contacts (*Id.* at pp. 21, 37, 61)' and

---

[19] *See Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017) ("It is somewhat unusual to see an Eighth Amendment case relating to medical care in a prison in which the plaintiff does not argue that the individual medical provider was deliberately indifferent to a serious medical need."); *Daniel v. Cook Cnty.*, 833 F.3d 728, 733 (7th Cir. 2016) ("Most inmates who believe their right to health care has been violated . . . seek damages from individual doctors or other health care professionals, or from correctional staff who might have ignored or interfered with the inmates' efforts to seek the health care they need.")

- MHPs mishandling review of disciplinary cases (*Id.* at pp. 19, 20, 21, 46, 48).[20]

The question now is whether Plaintiff has any evidence that those systemic problems impacted the care Dontrell received and whether Baldwin can be held liable. As a senior prison official, Baldwin can be liable for a constitutional violation based on alleged systemic deficiencies if he was "aware of a systemic lapse in enforcement of a policy critical to ensuring inmate safety" but "fail[ed] to enforce the policy" *Daniel v. Cook Cnty.*, 833 F.3d 728, 737 (7th Cir. 2016) (citation omitted); *accord Sinn v. Lemmon*, 911 F.3d 412, 423 (7th Cir. 2018). *See also Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 489 (7th Cir. 2022) ("As a practical matter, deliberate indifference . . . can be demonstrated by proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." (quoting *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983))) (internal quotation marks omitted). However, even if the prison official is actually aware of a systemic problem that poses a substantial risk of serious harm to inmates, "[e]vidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference." *Rasho appeal*, 22 F.4th at 710 (citing *Farmer*, 511 U.S. at 844); *see also Sinn*, 911 F.3d at 423–24; *Rosario*, 670

---

[20] The Court also notes that Plaintiff does not appear to be challenging the IDOC's use of segregation for mentally ill inmates as unconstitutional in and of itself. In response to Wexford's statement of material facts, Plaintiff asserted that "segregation was not appropriate for inmates with mental illness as it leads to decompensation" (Doc. 173, p. 8). However, she never developed this argument in the body of her brief or submitted the necessary evidence to support this type of claim, such as evidence regarding the conditions in segregation at Lawrence (*see* Doc. 173).

F.3d at 821–22 ("[T]he officers may escape liability even if they did not take perfect action."). Similarly, "the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation." *Rasho*, 44 F.4th at 710 (citation omitted).

Here, Plaintiff contends that Dontrell was denied access to proper services, evaluations, or treatment due to systemic deficiencies in the IDOC's mental health care system that Baldwin knew about but failed to address (Doc. 95, pp. 12–13; *see also* Doc. 173, pp. 51, 56). More specifically, Plaintiff seems to be alleging that John Baldwin failed to ensure the policies and practices regarding mental health care were being followed. Baldwin makes several arguments as to why he cannot be held liable for deliberate indifference (Doc. 144, pp. 14–21). The Court opts to skip straight to Baldwin's argument that he is entitled to summary judgment because he took substantial steps during his tenure to improve the IDOC's mental health care system (Doc. 144, p. 20).

As an initial matter, the Court notes that the Seventh Circuit already determined there was no deliberate indifference to the systemic deficiencies in the IDOC's mental health delivery system because "the evidence establishes that IDOC made reasonable efforts to cure the deficiencies in the five areas identified in the plaintiffs' claim and to alleviate the staffing shortage." *Rasho appeal*, 22 F.4th at 710. Plaintiff, however, argues that the Seventh Circuit focused on "various remedial steps taken 'in the first half of 2018'" and its holding that the IDOC was not deliberately indifferent "was therefore specific to actions in 2018," which was after Dontrell died (Doc. 192) (citing *Rasho appeal*, 22 F.4th at 708, 712). In other words, Plaintiff claims the Seventh Circuit's opinion in *Rasho*

leaves open the possibility of finding Baldwin deliberately indifferent based on his conduct in 2017, prior to Dontrell's death.

Even if the Court assumes Plaintiff's interpretation of the *Rasho* decision is correct, there is evidence that a number of actions were taken between the time the settlement agreement was signed in May 2016 and Dontrell's death on December 1, 2017. *See also Rasho appeal*, 22 F.4th at 707 (acknowledging that witness testimony at the preliminary injunction hearings "revealed that the IDOC had clearly made progress in revamping its mental-healthcare system.")[21] For instance, Plaintiff admits Baldwin addressed staffing concerns by speaking with the IDOC's chief fiscal officer, requesting and sending letters to Wexford concerning contractual staffing obligations, partnering with Southern Illinois University to provide additional mental health services at specific institutions, and expanding the use of telehealth services (Doc. 144, p. 9, ¶27; Doc. 173, p. 13, ¶27). *See also Rasho preliminary injunction*, 2018 WL 2392847, at *19 (recognizing that the IDOC had "made efforts to recruit and attract [psychiatric and mental health] professionals.").

Baldwin also put forth evidence that he obtained funds and undertook construction and remodeling projects, such as establishing inpatient beds at Elgin, building a new inpatient facility at Joliet, and finalized and opened residential treatment units (Doc. 144-2, pp. 36, 57, 61, 145–46, 147). *See also Rasho v. Walker*, CDIL Case No. 07-

---

[21] The preliminary injunction hearings were held shortly after Dontrell's death on December 18 and 19, 2017, and February 27–March 2, 2018. *Rasho v. Walker*, No. 07-1298, 2018 WL 2392847, at *6 (C.D. Ill. May 25, 2018) ("*Rasho preliminary injunction*").

1298, Doc. 1646, pp. 8–9 (November 29, 2017) (Pablo Stewart's Mid-Year Report) (indicating that the RTU at Joliet began accepting patients on November 6, 2017 and construction on the RTU at Dixon was close to being finished); *Rasho appeal*, 22 F.4th at 707 (describing witness testimony at the preliminary injunction hearings that IDOC had spent $45 million to build new residential treatment units at several facilities, spent $75 million to develop a new data system for intake assessments, procured another $150 million to construct a new inpatient facility).

Baldwin also implemented additional mental health training for all staff through a program developed and taught by the National Alliance of Mental Illness (Doc. 144-2, p. 147). *See also Rasho appeal*, 22 F.4th at 707 (describing witness testimony at the preliminary injunction hearings that the IDOC had delivered mental-health training to its entire staff). And Plaintiff admitted that Baldwin had numerous meetings and modified the policy regarding discipline for mentally ill inmates, in particular to have MHPs more involved in the disciplinary process (Doc. 144, p. 7, ¶23; Doc. 173, p. 13, ¶23; *see also* Doc. 144-6).

The Court also notes that Dr. Pablo Stewart stated in his First Annual Report issued in May 2017 that "significant improvements to the mental health care delivery system in IDOC" had been made in the first year of the settlement agreement. *Rasho v. Walker*, CDIL Case No. 07-1298, Doc. 1373, p. 9. Similarly, Dr. Stewart noted in his Mid-Year Report issued in November 2017 that the IDOC "ha[d] made significant progress on a number of requirements." *Id.* at Doc. 1646, p. 17; *see also* pp. 8–9. This report cited, in particular, to a number of improvements and positive aspects in the mental health care

at Lawrence specifically. *Id.* at pp. 23, 25, 26, 27, 30, 31, 33, 36, 43, 66, 67, 101. Moreover, Dontrell's own medical records reflect a marked difference in the care he was receiving in the two months preceding his death (*see* Doc. 141-5, pp. 225–359). He attended group therapy at least twice a week, almost without exception. He had contact with an MHP every week on rounds. He had one-on-one sessions with MHPs numerous times. And he saw the psychiatric PA twice.

Plaintiff did not make even a minimally complete argument, or present any evidence, that these efforts did not constitute a reasonable response to the systemic problems (*see* Doc. 173). Plaintiff's entire argument is one sentence: "[W]hile Baldwin has made some efforts to improve, it was not sufficient to resolve the constitutionally inadequate care, and therefore is not enough to absolve Baldwin of liability for known continuing constitutional violations" (Doc. 173, p. 57). Undeveloped and conclusory analysis such as this is simply not enough to survive summary judgment. *See United States v. Useni,* 516 F.3d 634, 658 (7th Cir. 2008) ("We have repeatedly warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."). Nor is it the Court's responsibility to research, construct, and then develop any argument that could have been made for Plaintiff. *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011); *Alioto v. Town of Lisbon,* 651 F.3d 715, 721 (7th Cir. 2011) ("Our system of justice is adversarial, and our judges are busy people. . . . [T]hey are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning.") (citation omitted).

Consequently, Baldwin is entitled to summary judgment on Plaintiff's deliberate

indifference claim against him. In light of this conclusion, there is no need to reach the question of whether Baldwin is entitled to qualified immunity.

### 2. State-Law Claims (Counts 4 and 6)

Plaintiff brought claims against John Baldwin under the Illinois Wrongful Death Act, 740 ILL. COMP. STAT. 180/1, and the Illinois Survival Act, 755 ILL. COMP. STAT. 5/27-6, based on negligence and willful and wanton conduct (Doc. 95, pp. 18–26). Baldwin argues these claims are barred by sovereign immunity under the Illinois State Lawsuit Immunity Act, 745 ILL. COMP. STAT. 5/1 (Doc. 144, p. 24-26). The Court agrees.

The Illinois State Lawsuit Immunity Act "protects the State against being 'made a defendant or party in any court.'" *Murphy v. Smith*, 844 F.3d 653, 658 (7th Cir. 2016) (quoting 745 ILL. COMP. STAT. 5/1). Protection under the statute also extends to state employees, even when they are sued in their individual capacity, if the claim against the employee equates to a claim against the state. *Richman v. Sheahan*, 270 F.3d 430, 441 (7th Cir. 2001). However, sovereign immunity does not apply and "affords no protection" in suits where the plaintiff alleges that state employees violated "statutory or constitutional law." *Murphy*, 844 F.3d at 659 (citation omitted). *See also Turpin v. Koropchak*, 567 F.3d 880, 884 (7th Cir. 2009) ("The officer suit exception provides that when an officer of the State commits an unconstitutional act or violates a statute, the suit is not against the State, because the State is presumed not to violate its own constitution or enactments.").

The Court previously declined at the pleadings stage to dismiss Plaintiff's state-law claims against Baldwin on the basis of sovereign immunity because Plaintiff *alleged* that the conduct underlying the state-law claims also violated Dontrell's constitutional

rights (Doc. 85, pp. 12–14). Now, however, the Court has determined that Plaintiff's constitutional claim against Baldwin failed to survive summary judgment. Therefore, sovereign immunity is back in play, and it bars Plaintiff's state-law claim against Baldwin because there is no question it is actually a claim against the State of Illinois. "Where a charged act of negligence 'arose out of the State employee's breach of a duty that is imposed on him *solely* by virtue of his State employment, sovereign immunity will bar maintenance of the action' in any court other than the Illinois Court of Claims." *Turner v. Miller*, 301 F.3d 599, 602 (7th Cir. 2002) (quoting *Currie v. Lao*, 592 N.E.2d 977, 980 (Ill. 1992)) (emphasis in original). *See also Murphy*, 844 F.3d at 659 (setting forth three factors for evaluating when a claim against a state employee is a claim against the state). Baldwin's conduct that Plaintiff complained of certainly involved matters normally within the scope of his employment. And Baldwin is accused of breaching duties he owed to Dontrell and other inmates solely based on their status as prisoners and Baldwin's employment as the Acting Director of the IDOC. Consequently, Plaintiff's state law claims against Baldwin are deemed to be claims against the State of Illinois, and, as such, they are barred in this Court by the Illinois State Lawsuit Immunity Act. Summary judgment is granted in favor of Baldwin as to Counts 4 and 6.

## B.  CLAIMS AGAINST WEXFORD

### 1.  State-Law Claims (Counts 5 and 7)

As with Baldwin, Plaintiff brought claims against Wexford under the Illinois Wrongful Death Act, 740 ILL. COMP. STAT. 180/1, and the Illinois Survivor Act, 755 ILL. COMP. STAT. 5/27-6, based on negligence and willful and wanton conduct (Doc. 95, pp.

18–26). Wexford makes several arguments as to why these claims should be dismissed, including that (1) "willful and wanton conduct" cannot stand as an independent cause of action, (2) the certificate of merit attached to the complaint failed to sufficiently state that a reasonable and meritorious cause of action existed against Wexford for institutional negligence or vicarious negligence, and (3) Plaintiff does not have any expert testimony that can be used to establish the elements of his claims, as required by Illinois law (Doc. 141, pp. 9–22).

The Court turns first to Wexford's argument that the "willful and wanton" claim should be dismissed because it is not a proper claim (Doc. 141, pp. 9–10). Plaintiff did not respond to this argument (*see* Doc. 173). Even still, the Court is not convinced that dismissal is required. It is true that the Illinois Supreme Court has said "[t]here is no separate and independent tort of willful and wanton conduct." *Krywin v. Chicago Transit Auth.*, 938 N.E.2d 440, 452 (Ill. 2010) (citing *Ziarko v. Soo Line R.R.*, 641 N.E.2d 402, 406 (Ill. 1994)). However, Wexford did not cite to any binding authority indicating that a willful and wanton claim must be dismissed when a claim of ordinary negligence is also alleged (Doc. 141, pp. 9–10). *E.g., Townsel v. DISH Network L.L.C.*, 668 F.3d 967, 970 (7th Cir. 2012). And there are courts that have permitted the two claims to co-exist. *Doe v. Coe*, 135 N.E.3d 1, 20 (Ill. 2019) (affirming appellate court's decision to reinstate willful and wanton counts that overlapped with negligence counts); *McCoy v. Iberdrola Renewables, Inc.*, No. 11 C 592, 2013 WL 4027045, at *4 (N.D. Ill. Aug. 7, 2013) (quotation marks omitted) (denying motion for summary judgment as to the plaintiff's willful and wanton claim because it was "no more than a supplemental allegation of negligence. . . a claim in name only.") (internal

quotation marks and citation omitted).[22] In this instance, there is simply no harm in allowing the willful and wanton claim to proceed and analyzing it contemporaneously with the ordinary negligence claim. *See Doe-2 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*, 593 F.3d 507, 514 (7th Cir. 2010) ("Under Illinois law, a plaintiff pleading willful and wanton misconduct must establish the same basic elements of a negligence claim . . . .") (citing *Krywin*, 938 N.E.2d at 890)).

Next, the Court opts to skip over Wexford's argument regarding the certificate of merit and go straight to the argument regarding the sufficiency of Plaintiff's evidence. Plaintiff alleges that Wexford acted negligently or willfully and wantonly in seventeen different respects (Doc. 95, pp. 20–21, 24–25). Plaintiff made clear in her response brief that these claims are based on both Wexford's own institutional negligence as well as vicarious liability for the negligence of its employees (Doc. 173, p. 42). *E.g., Groeller v. Evergreen Healthcare Ctr. LLC*, 31 N.E.3d 869, 875 (Ill. App. Ct. 2015) ("Under Illinois law, a hospital may be found liable in a medical negligence case under two separate and distinct theories: (1) liability for its own institutional negligence and (2) vicarious liability

---

[22] Willful and wanton claims are also routinely permitted when the claim is against a governmental entity or employee subject to an immunity statute that recognizes willful and wanton misconduct as a basis for liability. It does not appear to the Court that this is one of those cases. *See Krywin*, 938 N.E.2d at 452 (analyzing the merits of a willful and wanton claim in a case that was tried by a jury on counts of negligence and willful and wanton conduct); *Gordon v. Devine*, No. 08 C 377, 2008 WL 4594354, at *8 (N.D. Ill. Oct. 14, 2008) (acknowledging "lingering confusion" as to whether there is an independent tort for willful and wanton conduct in Illinois and concluding that a claim against a public official subject to the Illinois Local Government and Governmental Employees Tort Immunity Act, 745 ILL. COMP. STAT. 10/2-102, should be permitted but not a claim against private individuals); *Owens v. Fleet Car Lease, Inc.*, No. 09-CV-0967-MJR, 2010 WL 11566100, at *2 (S.D. Ill. Jan. 15, 2010) (same); *Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc.*, No. 05 C 1698, 2005 WL 3159680, at *10 n.7 (N.D. Ill. Nov. 22, 2005) (noting willful and wanton is a proper claim when it is against one of various governmental entities or employees and citing cases as examples).

for medical negligence of its agents or employees."). Under either theory, Plaintiff has the burden of establishing the applicable standard of care, the unskilled or negligent manner in which the standard was breached, and a causal connection between the breach and the injury sustained. *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 461 (7th Cir. 2020) (citation omitted). With respect to the willful and wanton claim, Plaintiff must also prove "[a] deliberate intention to harm or a conscious disregard for the plaintiff's welfare." *Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*, 973 N.E.2d 880, 887 (Ill. 2012) (citation omitted).

In Illinois, "[t]he general rule is that expert testimony is required to establish" the standard of care, breach, and causation. *Donald*, 982 F.3d at 461 (citation omitted). But certainly "proximate cause 'must be established by expert testimony to a reasonable degree of medical certainty.'" *Miranda v. Cnty. of Lake*, 900 F.3d 335, 348 (7th Cir. 2018) (quoting *Morisch v. United States*, 653 F.3d 522, 531 (7th Cir. 2011)).

Here, because Plaintiff's expert psychiatrist, Dr. Sanjay Adhia, has been excluded, Plaintiff has no expert competent to testify about the standard of care, how the standard was breached, or how the breach caused Dontrell's injury. Nor does she have any evidence to rebut the testimony of Defendants' experts Dr. Shane Reister and Dr. Michael Jarvis that the mental health professionals who treated Dontrell rendered appropriate care (Doc. 144-5 pp. 26–27; Doc. 142-4, p. 12). And Plaintiff did not provide any explanation as to how she could establish the elements of her claims by evidence other than expert testimony (*see* Doc. 173). Consequently, Wexford is entitled to summary judgment as to Counts 5 and 7.

### 2.  Deliberate Indifference

Plaintiff spends nearly ten pages of her response brief arguing that Wexford is liable for deliberate indifference for providing constitutionally insufficient mental health care to Dontrell (Doc. 173, pp. 32–42). This argument came as a surprise to the Court and apparently to Wexford as well, (*see* Doc. 180, pp. 1–2), given that Plaintiff did not assert an Eighth Amendment claim against Wexford in the operative complaint (*see* Doc. 95). That being said, a plaintiff is not required to plead legal theories in the complaint. *E.g.*, *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010). Furthermore, as Plaintiff notes, she has consistently alleged that Wexford exhibited "utter indifference and/or conscious disregard" in failing to provide constitutionally adequate mental health care to Dontrell (Doc. 95, pp. 24–25; Doc. 52; Doc. 1), which is essentially the same thing as asserting an Eighth Amendment claim for deliberate indifference. *See Chapman v. Keltner*, 241 F.3d 842, 847 (7th Cir. 2001) ("[T]he standard for assessing whether conduct is willful and wanton is 'remarkably similar' to the deliberate indifference standard.") (citation omitted). In other words, Plaintiff is simply offering "an alternative legal characterization" of the same factual allegations, *Whitaker v. Milwaukee Cnty., Wisconsin*, 772 F.3d 802, 808 (7th Cir. 2014), which the Seventh Circuit has said should be permitted "unless the changes unfairly harm the defendant or the case's development—for example, by making it 'more costly or difficult' to defend the case, or by causing unreasonable delay." *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017) (citation omitted). *See Whitaker*, 772 F.3d at 808–09 (7th Cir. 2014) (holding plaintiff could proceed on new summary judgment theory that recharacterized already-

alleged facts and did not offer "any unfair surprise"); *CMFG Life Ins. Co. v. RBS Sec., Inc.,* 799 F.3d 729, 743–44 (7th Cir. 2015) (holding plaintiff did not inappropriately add new claim during summary judgment briefing when factual basis was alleged in complaint). Although it may seem unjust to allow Plaintiff to pursue a deliberate indifference claim against Wexford given the pleading history in this case, (*see* Doc. 180, pp. 1–2; *see also* Docs. 85, 95, 104), Wexford failed to persuasively argue that it would cause unfair harm (*see* Doc. 180, pp. 1–2). Consequently, the claim will be permitted.

That being said, if Plaintiff does not have the expert evidence necessary to prove that Wexford's conduct was negligent, then she cannot possibly prove that it amounted to deliberate indifference, which is an even higher standard. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994) ("deliberate indifference entails something more than mere negligence"). At any rate, Plaintiff fails to mount an argument that would allow the Court to rule in her favor on the deliberate indifference claim. Much of Plaintiff's argument as to why Wexford is liable for deliberate indifference sounds in vicarious liability (*see* Doc. 173, pp. 32–42), but there is no vicarious liability under § 1983. *E.g., Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (private corporations acting under color of state law "are not vicariously liable for the constitutional torts of their employees or agents."); *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014 ("*Respondeat superior* liability does not apply to private corporations under § 1983."). Rather, a corporation that has contracted to provide essential government services, like Wexford, can only be held liable under § 1983 based on the *Monell* theory of municipal liability. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017) (*en banc*).

Under *Monell*, a plaintiff must show that his constitutional rights were violated by the corporation's own actions. *Pyles v. Fahim*, 771 F.3d 403, 409–10 (7th Cir. 2014) (citation omitted). There are at least three recognized types of corporate action that may give rise to liability under *Monell*: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Dean*, 18 F.4th at 235. *See also Glisson*, 849 F.3d at 379 (noting this list of actions is likely not exclusive).

Plaintiff does not explicitly indicate which theory she is proceeding under (*see* Doc. 95, Doc. 173), but it appears to the Court that Plaintiff is proceeding on the second theory: a widespread practice or custom that also affected other inmates.[23] The question then becomes what is the allegedly widespread practice or custom at issue? Plaintiff never specifically identified the exact practice or custom that allegedly caused Dontrell's injury (*see* Doc. 173, pp. 32–44), which is "critical" to properly analyzing whether summary judgment is appropriate. *Levy v. Marion Cnty. Sheriff*, 940 F.3d 1002, 1011 (7th Cir. 2019). In fact, in the portion of her brief dedicated to arguing in support of liability against Wexford, Plaintiff never even used the words "practice" or "custom" (*see* Doc. 173, pp. 32–44), aside from when she set forth the legal standard for a *Monell* claim (*id.* at pp. 32–

---

[23] The Court arrives at this conclusion by a process of elimination. The first theory is not viable because, as Plaintiff admitted, all of the express policies at issue in this lawsuit are IDOC policies (*see* Doc. 173, p. 2), and she did not argue that any of the policies as written are unconstitutional, (*see* Doc. 173), nor do any of the policies seem constitutionally problematic on their face. Nor can it be the third theory because Plaintiff does not appear to argue that an official with final policy-making authority caused the deficient mental health treatment Dontrell purportedly received (*see id.*). That leaves the second theory: that, by custom and practice, Wexford denied Dontrell adequate mental health treatment.

33). Plaintiff spent over eight pages recounting aspects of Dontrell's mental health care and how it purportedly violated the IDOC's policies and directives, but never articulated how the purported problems were emblematic of a widespread practice or custom (*see id.* at pp. 34–42). Nor did she set forth evidence suggesting that each of these purported problems was actually a systemic issue in the IDOC (*see id.*); for the most part, she only presented evidence of Dontrell's own experience (*see id.*). However, "[t]o prove an official policy, custom, or practice within the meaning of *Monell*," a plaintiff "must show more than the deficiencies specific to his own experience, of course." *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016). Plaintiff's entire discussion is devoid of any legal reasoning or analysis and does not include a single citation to legal authority (*see id.*).

At this late stage of litigation, neither the Court nor Defendants should have to speculate as to what, exactly, Plaintiff is claiming. A primary purpose of summary judgment is "to weed out unfounded claims." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 688 (7th Cir. 2008). It would defeat this purpose if Plaintiff were allowed to proceed to trial on a claim whose contours she has never clearly articulated. *See Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 353 (7th Cir. 1982) ("The district court is not required, however, to speculate over the nature of the plaintiffs' claim or to refuse to enter summary judgment for the defendant simply because the plaintiffs may, theoretically, be entitled to recover under a cause of action based on facts never alleged in the complaint.").

The Court once again concludes that Plaintiff has failed to provide the Court with any argument sufficient to show the existence of a genuine issue of material fact. Summary judgment is therefore appropriate.

## C. Claims Under the ADA and the Rehab Act (Counts 2 & 3)

Plaintiff claims that Dontrell was discriminated against, or otherwise denied access to services, programs, or activities, due to his disability, in violation of Title II of the ADA and the Rehabilitation Act (Doc. 95, pp. 3, 14–18; Doc. 173, pp. 45–49). Specifically, Plaintiff alleged that Dontrell was so seriously mentally ill that he required "intensive psychiatric therapy and treatment," which the IDOC did not have the ability to provide (Doc. 95, ¶¶62, 65; *see also* Doc. 122, pp. 7–8). Rather than transferring Dontrell to another IDOC facility or an outside hospital where he could receive proper care, the IDOC put Dontrell in segregation because of his mental illness, where he "was deprived of access to services, programs, and activities, including education, programming, recreation, exercise, human interaction, and mental health treatment and services" (Doc. 95, ¶¶3, 67, 68; *see also* Doc. 122, pp. 7–8).

Because the ADA and the Rehab Act, as well as the federal regulations implementing them, are "materially identical," claims under either statute require the same analysis. [24] *A.H. ex rel. Holzmueller v. Illinois High Sch. Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018) (citing *Steimel v. Wernert*, 823 F.3d 902, 909 (7th Cir. 2016)). *See also* 42 U.S.C. §12132; 29 U.S.C. § 794(a). For the sake of ease, the Court generally refers only to the ADA, but the analysis applies to both the ADA and Rehab Act claims, unless otherwise stated.

To succeed on her claim of disability discrimination, Plaintiff must prove that

---

[24] The only notable difference is that the Rehab Act includes as an additional requirement the receipt of federal funds, but this element is incontrovertible because all states accept it for their prisons. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015); *Jaros v. Illinois Dep't of Corr.*, 685 F.3d 667, 671–72 (7th Cir. 2012).

Dontrell was "a qualified individual with a disability," that he "was denied the benefits of the services, programs, or activities" of the prison, or "otherwise subjected to discrimination" by the prison, and that the denial or discrimination was because of his disability. *Shuhaiber v. Illinois Dep't of Corr.*, 980 F.3d 1167, 1170 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 2475 (2021) (citing *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015)). The IDOC does not contest that Dontrell was a qualified individual with a disability by virtue of his "severe mental illness" (Doc. 95, p. 14; *see* Doc. 144, pp. 21–23; Doc. 182). The disputed issues are whether Dontrell was discriminated against and whether that discrimination was by reason of his disability.

Discrimination can be established in three different ways: (1) "the defendant intentionally acted on the basis of the disability" (disparate treatment claim), (2) "the defendant refused to provide a reasonable modification" (failure to accommodate claim), or (3) "the defendant's rule disproportionally impacts disabled people" (disparate impact claim). *A.H.*, 881 F.3d at 592–93 (citation omitted). Regardless of which theory Plaintiff's claim rests on, the Seventh Circuit has held the language of both statutes "requires [the plaintiff] to prove that, 'but for' his disability, he would have been able to access the services or benefits desired." *A.H.*, 881 F.3d at 593 *(*citation omitted).[25]  *See also* 42 U.S.C. § 12132 (prohibiting discrimination against individuals "by reason of" their disability);

_____

[25] *Accord Cook Cnty., Illinois v. Wolf*, 962 F.3d 208, 227 (7th Cir. 2020), *cert. dismissed sub nom. Mayorkas v. Cook Cnty., Illinois*, 141 S. Ct. 1292 (2021) (but for causation required). *See also* 7th Cir. Jury Instr. § 4.02 (2015 rev.), http://www.ca7.uscourts.gov/Pattern_Jury_Instr/7th_cir_civil_instructions.pdf (defining causation requirement under the ADA as "Defendant would not have [taken action] if Plaintiff had not had a disability, but everything else had been the same.").

29 U.S.C. § 794(a) (prohibiting discrimination against individuals "solely by reason of" their disability). Furthermore, in order for Plaintiff to recover compensatory damages, she must show "intentional conduct (and not mere negligence) by a named defendant," which has been interpreted to mean she must show the defendant "acted with deliberate indifference to rights conferred by the ADA and Rehabilitation Act." *Shaw v. Kemper*, 52 F.4th 331, 334 (7th Cir. 2022) (citations omitted). *See also Hildreth v. Butler*, 960 F.3d 420, 431 (7th Cir. 2020) (quoting *Lacy v. Cook County, Illinois*, 897 F.3d 847, 862 (7th Cir. 2018)).

It is not clear to the Court whether Plaintiff is pressing a disparate treatment or failure to accommodate claim or both (*see* Doc. 95; Doc. 173).[26] *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1125 (7th Cir. 2006) ("It is important for plaintiffs to be clear about whether they are pressing disparate treatment or failure-to-accommodate claims (or both) because the two are analyzed differently.") (citations omitted). On the one hand, the complaint expressly stated that the IDOC's liability for violating the ADA was rooted in a failure to accommodate (*see* Doc. 95, ¶70; *see also id.* at ¶¶59, 63, 64, 65, 67, 68). In its motion for summary judgment, the IDOC understood Plaintiff to be asserting only a failure to accommodate claim (*see* Doc. 144, pp. 21–23). And in opposing summary judgment, Plaintiff did not expressly dispute the IDOC's characterization of her claims as a failure to accommodate (*see* Doc. 173, pp. 45–49). However, Plaintiff's response brief did not necessarily frame her claim as a failure to accommodate; in fact, she never even used the words "accommodate" or "accommodation" in her brief (*see id.*). Nor do her

---

[26] There is nothing that suggests Plaintiff intended to bring a disparate impact claim (*see* Doc. 95; Doc. 173).

arguments follow the framework for analyzing a failure to accommodate claim (*see id.*).

On the other hand, various assertions in Plaintiff's complaint and response brief seem to suggest she is invoking a disparate treatment theory of liability (*e.g.*, the IDOC failed to provide Dontrell treatment for his mental illness, Dontrell was put in segregation because of his mental illness/punished for his mental illness (Doc. 95, ¶¶65–69; Doc. 173, p. 47)). *See, e.g., Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1021–22 (7th Cir. 1997) ("'Discrimination' as used in the ADA . . . means treating 'a qualified individual with a disability' differently because of the disability, i.e., disparate treatment.") (citation omitted); *Timmons*, 469 F.3d at 1126 ("The plaintiff's prima facie case typically requires a showing that the plaintiff was disabled . . . and treated less favorably than a nondisabled, similarly situated person."); *Vaughn v. Walthall*, 968 F.3d 814, 819 (7th Cir. 2020) (the "unjustified segregation of persons with disabilities" is a form of discrimination under the ADA) (quoting *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999)).

But Plaintiff never expressly called her claim a disparate treatment claim (*see* Doc. 95, Doc. 173). Her allegations are not clearly framed as a disparate treatment claim (*see* Doc. 95, Doc. 173). Nor did she set forth the legal framework for a disparate treatment claim or otherwise analyze the facts within the applicable framework; in fact, she utterly failed to present any sort of developed or substantive argument with citations to legal authority of the sort that would be expected for a disparate treatment claim (*see* Doc. 95, Doc. 173). And she completely failed to counter the IDOC's arguments and evidence that Dontrell was not denied access to mental health services in segregation in the months leading up to his death, nor was Dontrell put in segregation solely because he was

mentally ill—he was put in segregation for disciplinary and security-related reasons (Doc. 144, p. 23). For these reasons, the Court finds that Plaintiff has waived any disparate treatment claim she may have had (*see* Doc. 95, Doc. 173). *See Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

As for a failure to accommodate claim, Plaintiff has the burden of making a prima facie showing that a requested accommodation is both reasonable and necessary to avoid discrimination on the basis of disability. *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 751, 754 (7th Cir. 2006); *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 783–84 (7th Cir. 2002). An accommodation is "necessary" if it "allows the disabled to obtain benefits that they ordinarily could not have by reason of their disabilities, and not because of some quality that they share with the public generally." *Wisconsin Cmty. Servs.*, 465 F.3d at 754 (citing *Alexander v. Choate*, 469 U.S. 287, 302 (1985)). Whether an accommodation is "reasonable" is "a highly fact-specific inquiry and requires balancing the needs of both parties." *Wisconsin Cmty. Servs.*, 465 F.3d at 752 (quoting *Oconomowoc*, 300 F.3d at 784). "An accommodation is reasonable if it is both efficacious and proportional to the costs to implement it." *Wisconsin Cmty. Servs.*, 465 F.3d at 752 (citation omitted). "An accommodation is unreasonable if it imposes undue financial or administrative burdens or requires a fundamental alteration in the nature of the program." *Id.* (citation omitted). Furthermore, in the prison context, whether accommodations are reasonable must be judged "in light of the overall institutional requirements," including "[s]ecurity concerns, safety concerns, and administrative exigencies." *Hildreth*, 960 F.3d at 431 (quoting *Love v. Westville Correctional Center*, 103 F.3d

558, 561 (7th Cir. 1996)).

While Plaintiff did plead what was necessary to state a claim (*see* Doc. 122), her claim seems to fall apart at the summary judgment stage. Her sole argument in opposing summary judgment can be fairly summarized as Dontrell needed to be transferred to a higher level of care, but instead of properly treating his mental illness, the IDOC punished him for it by sending him to segregation (*see* Doc. 173, pp. 45–49). Based on this argument, however, it is no longer clear what the contours of her claim are or that she has sufficiently stated a claim. Specifically, Plaintiff must prove Dontrell was "denied the benefits of services, programs, or activities" due to the IDOC's failure to provide a reasonable accommodation for his mental illness. Plaintiff initially identified the "services, programs, or activities" at the foundation of her claim as "education, programming, recreation, exercise, human interaction, and mental health treatment and services." (Doc. 95, ¶68). However, in opposing summary judgment, Plaintiff made no argument and presented no evidence regarding any "education, programming, recreation, exercise, [or] human interaction" that Dontrell was unable to access (*see* Doc. 173, pp. 45–49). Her arguments only touched on mental health treatment and services (*see id.*). But if mental health care is the service Dontrell was denied access to, then Plaintiff's claim is hopelessly circular. The accommodation she asserts Dontrell should have received (*i.e.,* a transfer to a higher level of care) is the *same* as the service (*i.e.,* mental health care in the form of a transfer to a higher level of care) that she claims Dontrell was denied access to. In other words, Plaintiff's claim is that Dontrell was denied access to mental health care because the IDOC failed to reasonably accommodate his disability by

providing him with mental health care. When it comes to causation, the argument is likewise circular: but for Dontrell's mental illness, he could have accessed mental health care. Dontrell's mental illness was not the reason he was unable to access mental health services; rather, it was the reason he needed such services. *Schnauder v. Gibens*, 679 Fed. Appx. 8, 11 (2d Cir. 2017). *See also Tardif v. City of New York*, 991 F.3d 394, 406 (2d Cir. 2021) ("[W]e held that the Rehabilitation Act 'does not create a cause of action based on a [disability] that is directly related to providing the very services at issue.'" (quoting *Cushing v. Moore*, 970 F.2d 1103, 1109 (2d Cir. 1992))).

It is clear that, at its core, Plaintiff's argument is not that Dontrell was denied mental health care *because* he had a disability. Instead, her claim relates solely to whether Dontrell received *adequate* mental health care *for* his disability. The evidence shows that Dontrell was not outright denied mental health care. He received various mental health services in segregation in the months leading up to his death, including numerous one-on-one therapy sessions and meetings with crisis team members, group therapy sessions, diagnostic evaluations, treatment plans, medication adjustments, suicide evaluations, and crisis placements. But Plaintiff argues that he should have been transferred to a mental health facility for increased care. This is essentially a complaint that Dontrell did not receive a particular type of treatment or service that Plaintiff believes he should have gotten. But the ADA cannot be used to litigate claims for inadequate treatment. *See Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) ("[T]he Act would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners. . . . The ADA does not create a remedy for medical malpractice."); *Thomas v. Dart*, No. 17-CV-4233, 2021 WL

2948907, at *4 (N.D. Ill. July 14, 2021) (explaining that "outright denial of medical care is cognizable under the ADA, while provision of incompetent medical care is not" and collecting cases). *See also McGugan v. Aldana-Bernier*, 752 F.3d 224, 231–32 (2d Cir. 2014) (explaining that a doctor's refusal to prescribe a particular treatment, which the disabled patient has requested, based on the doctor's professional assessment that the treatment is inappropriate or would be harmful "is not discrimination in violation of the [Rehab Act], even if the doctor's medical analysis is flawed. Such a decision may be malpractice, but it is not discrimination.").

In conclusion, the Court finds that, based on the arguments made by Plaintiff and the evidence currently in the record, no reasonable jury could find the IDOC liable for violations of the ADA and Rehab Act and summary judgment is appropriate. To be clear, the Court is not concluding that there is no conceivable basis on which Plaintiff could recover under the ADA and Rehab Act. Rather, Plaintiff simply has not presented a cogent explanation, supported by legal citations, as to how the IDOC violated the ADA or Rehab Act.

## CONCLUSION

Plaintiff Jeanetta Williams suffered an enormous personal loss when her son Dontrell committed suicide in IDOC custody on December 1, 2017. Any loss of life—especially that of a 21 year old young man—is tragic. The Court does not arrive at the result it reaches here today lightly and dedicated countless hours scouring the summary judgment and *Daubert* briefing and supporting exhibits. But the Plaintiff is the master of the complaint. And in this instance, the Plaintiff took an individual action and advanced

theories of liability against the Director of the *entire* Illinois Department of Corrections and Wexford Health Services for systemic deficiencies. She did not name correctional officers like Goble or Givens, MHPs, or even the Warden or Medical Director at Lawrence. And then she built her case—her theory of liability—around *Rasho*. But she developed no evidence linking the systemic problems identified in *Rasho* to Dontrell's personal experience. And then the other shoe dropped. The district court's holdings from *Rasho* that Plaintiff relied on were reversed by the Seventh Circuit Court of Appeals. Accordingly, based on the evidence presented and arguments made, Plaintiff cannot defeat Defendants' motions for summary judgment and take this case to trial.

The motions filed by Defendants John Baldwin, the Illinois Department of Corrections, and Wexford Health Sources, Inc. seeking summary judgment and to exclude Plaintiff's experts (Docs. 140, 142, 144, 145), are **GRANTED**. Judgment is granted in Defendants' favor and this case is **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment and close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: February 2, 2023**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**